UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**AEYIOU P. KAZOLIAS, KEVIN H. ROXBY,
and ROBERT C. SWINGLE**

                                    **Plaintiffs,**

               - *against* -

**IBEW LU 363, JOHN MARAIA, as Business Manager
of LU 363, LIGHTMORE ELECTRIC, and
ANDREW H. POPIK as President of Lightmore
Electric,**

                                    **Defendants.**

**09 Civ. 7222 (RO)(LMS)**

**REPORT AND
RECOMMENDATION**

---

**TO: THE HONORABLE RICHARD OWEN, U.S.D.J.[1]:**

On August 17, 2009, Plaintiffs Aeyiou P. Kazolias, Kevin H. Roxby, and Robert C.

Swingle, then proceeding *pro se*, filed their original complaint against the electrical union to

which they belong, the International Brotherhood of Electrical Workers Local Union 363

(herein, "the union"); the union's Business Manager, John Maraia (herein, "Maraia"); their

former employer, Lightmore Electric (herein, "Lightmore"); and Lightmore President Andrew

Popik (herein, "Popik"). Compl., Docket Entry (herein, "D.E.") 1. The parties stipulated to the

dismissal of all claims against defendants Lightmore Electric and Andrew Popik, which Your

Honor so-ordered on October 20, 2011. Stipulation and Order of Dismissal, D.E. 64.

Plaintiffs are journeymen wiremen (electricians) whose conflict with their union began

when the union failed to resolve their grievances against Lightmore to their satisfaction

---

[1]The Hon. Stephen C. Robinson, U.S.D.J., to whom the case was initially assigned,
referred this matter to me for all purposes. D.E. 2.

1

following Plaintiffs' termination from employment with Lightmore in 2008.  See D.E. 1.

Plaintiffs allege that the union then failed to refer them to jobs in retaliation for filing grievances

against Lightmore, complaints against the union with the National Labor Relations Board and

the Equal Employment Opportunity Commission, and this lawsuit.

On August 25, 2010, Plaintiffs, then still *pro se*, filed an Amended Complaint.  Am.

Compl., D.E. 39. Plaintiffs raised the following claims:

1) Defendants violated the union's duty of fair representation owed to all union members

by denying Plaintiffs job referrals for retaliatory reasons, and through additional retaliatory acts

alleged by each plaintiff and described more fully herein;

2)  Defendants improperly denied challenged job referrals, and engaged in additional

retaliatory acts alleged by each plaintiff, thereby violating Title I of the Labor-Management

Reporting and Disclosure Act ("LMRDA");

3) Defendants breached the IBEW International Constitution, a contract between the

local and international unions, in violation of Section 301 of the Labor Management Relations

Act, 29 U.S.C. § 185, ("LMRA"), by failing to adhere to the referral procedures in the collective

bargaining agreement (herein, the "CBA");

4) Defendants engaged in age discrimination and retaliation under the Age

Discrimination in Employment Act (the "ADEA") by denying plaintiffs job referrals, among

other retaliatory acts;

5) Defendants engaged in age discrimination and retaliation under New York Executive

Law Sections 290-297;

6) Defendants violated Title VII, see D.E. 39 ¶ 1;

7) Defendants violated the Equal Pay Act of 1963, see id.;

8) Defendants violated the Civil Rights Act of 1991, §§102-3, see id.;

9) Defendants retaliated against Plaintiffs in violation of Title I of the Americans with Disabilities Act (the "ADA"), see id.;

10) Defendants violated the Occupational Health and Safety Act ("OSHA"), see id. ¶13;

11) Defendants violated "New York State Private Sector Whistleblower Law," New York Labor Law §§740-41, see id. ¶ 14;

12) Defendants violated the National Electric Code, the "'National Fire Protection Association,' Arc-Flash Art. 70 and 70E," and the fire and building codes of the hamlet of Pearl River, New York, see id. ¶ 15;

13) Defendants violated the implied covenant of good faith and fair dealing, see id. at 1, ¶ 130;

14) Defendants engaged in the intentional infliction of emotional distress upon Plaintiffs, see id. at 1, ¶ 130.

In their opposition to the instant motion, Plaintiffs (who are no longer proceeding *pro se*) make no mention of claims 6 - 14 above, but do assert the following additional claims which have accrued since their Amended Complaint was filed.  Roxby alleges that Defendants disciplined him in violation of Section 609 of the LMRDA in January 2011 by supporting a finding that he had been terminated from a job at Travis Electric for being unqualified, and then by demoting him to third-year apprentice.  Plaintiffs also challenge additional job referrals which occurred after August 2010.

Defendants have moved for summary judgment on all claims. Defs.' Mem. of Law, D.E. 77.  Plaintiffs oppose this motion and seek to re-open discovery to take the deposition of an additional non-party witness, Rosario Olivieri, Pls.' Rule 56.1 Counter-Statement, D.E. 81, ¶86,

3

and request leave to file a second amended complaint, Pls.' Mem. of Law, D.E. 83, at 14.

For the reasons that follow, I conclude, and respectfully recommend that Your Honor should conclude, that summary judgment be granted in part and denied in part. In addition, I conclude that Plaintiffs' motions to file a second amended complaint and to depose Olivieri should be denied without prejudice.

## BACKGROUND

### I. The Union's Job Referral Procedures

Local Union 363 refers electricians to jobs with employers who are parties to the CBA, pursuant to the rules for job referral in Article IV of the CBA and additional written referral procedures implementing those rules.[2] Under the CBA, the union is the sole source of electricians for any employer bound by the agreement. The union ranks applicants in four groups according to their experience, qualifications, and place of residence, among other factors, where Group 1 consists of the most experienced electricians and Group 4 is the least. Within each group, the union ranks applicants chronologically by the dates on which they registered their availability for employment. This list of applicants, ranked by group and duration of unemployment, is called the "out-of-work" or "referral" list.

Under the CBA, when an employer contacts the union to request a certain number of electricians for a job, the union refers applicants to the employer from this out-of-work list by rank and by chronological order, so that those applicants in Group 1 who have been out of work the longest will be the first to be referred, and those applicants in Group 4 who have been out of

---

[2]Unless otherwise noted, the facts presented here are not disputed and are taken from Defendants' Rule 56.1 Statement, D.E. 70, Plaintiffs' Rule 56.1 Counter-statement, D.E. 81, and the Collective Bargaining Agreement ("CBA") to which the Union is a party, D.E. 76-1, -2, -3.

work for the shortest amount of time will be the last to be referred.  However, applicants may be referred out of chronological order under several exceptions contained in the CBA.  First, the employer may request only those electricians with particular skills or specialties required for the job, in which case the union refers the first applicant on the out-of-work list who possesses those skills.  Second, the CBA contains an age-ratio clause: it mandates that on jobs which require more than five journeymen, at least one of those journeymen must be fifty or older.  Third, CBA §2.02 permits employers to choose anyone on the referral list to be the foreman on a job ("The employer shall . . . have no restrictions, except those specifically provided for in the Collective Bargaining Agreement, . . . in determining the need and number as well as the person who will act as foreman. . . ").  Fourth, under the union's additional written referral rules, the Business Manager may appoint a steward to a job from anyone on the referral list, if he or she determines one is required.  See Olivieri Aff. Ex. B, D.E. 76-4, ¶ 16.  (Plaintiffs dispute the validity of these additional referral rules, as described further herein).  The Business Manager is tasked with administering the referral system.

## II.  Plaintiffs' Grievances against Lightmore

In December 2007, the union referred Plaintiffs to a job with Lightmore at the Verizon Blue Hill jobsite.  Plaintiffs were terminated on January 25, 2008.  On or about February 6, 2008, Plaintiffs filed a list of ten grievances against Lightmore, including failure to comply with safety protocol, as well as the claim that, as a result of their termination, no journeyman fifty or older remained on the job, in violation of the age-ratio provision of the CBA.  See D.E. 39-3 at 24 - 33.  The union's representative for that area, Gil Heim, conducted an investigation of the grievances and submitted a written report of his findings to Maraia on February 25, 2008. See D.E. 39-3 at 20-23.  Based on his investigation, Heim concluded that the majority of the

grievances lacked merit. In particular, he determined that Lightmore had not violated the age-ratio clause because after Plaintiffs were terminated, there were fewer than five journeymen assigned to the job, so the clause did not apply.

Nonetheless, the union secured concessions from Lightmore on all of the grievances Heim concluded had merit, as well as on several grievances Heim had found lacked merit. Lightmore agreed to hire a journeyman over age fifty. The union also placed a shop steward at the job site to prevent future violations. The resolution of the grievances was memorialized in a letter from Lightmore President Andrew Popik to Maraia, and forwarded to the Plaintiffs. See McGovern Aff. Ex. 25, D.E. 75-45, at 2 - 3.

On February 26, 2008, Maraia met again with Plaintiffs and presented the resolution the union had reached with Lightmore. Maraia asked Plaintiffs if they wanted to return to work for Lightmore. According to Defendants, Plaintiffs declined the offer. Plaintiffs, on the other hand, state that all but Swingle, who was noncommittal, *were* willing to return to work for Lightmore, but that Maraia deterred them from doing so. D.E. 81 ¶33 (p). Plaintiffs further contend that Maraia informed them that charges could be filed against them, ostensibly by Lightmore, were they to persist with their complaints against their former employer after the resolution had been reached. Id.

### III. Plaintiffs' Complaints against the Union

On June 4, 2008, Roxby filed unfair labor practice charges with the National Labor Relations Board against Lightmore and the union. See D.E. 70 ¶35. Roxby claimed that 1) the union had failed to process the safety-related grievances he and the other two plaintiffs had raised against Lightmore; 2) the union had threatened the plaintiffs with disciplinary action in retaliation for their grievances against Lightmore; and 3) the union had denied Plaintiffs job

referrals for "arbitrary reasons," such as in retaliation for their complaints against Lightmore.

McGovern Aff. Ex. 10, D.E. 75-28.  On July 24, 2008, the National Labor Relations Board

dismissed Mr. Roxby's complaints for lack of evidence.  See McGovern Aff. Ex. 11, D.E. 75-29.

Roxby's appeal of the dismissal to the general counsel for the NLRB was denied.  See McGovern

Aff. Ex. 12, D.E. 75-30.

On September 15, 2008, Plaintiffs Roxby and Kazolias filed charges of age

discrimination and retaliation against Lightmore and the union with the Equal Employment

Opportunity Commission ("EEOC").  See McGovern Aff. Ex. 13, D.E. 75-31; McGovern Aff.

Ex. 14, D.E. 75-32.

At the union's monthly meeting in February 2009, Maraia allegedly complained about

"the 3 or 4 members trying to bring down this Local with their petty claims of workmanship on

jobs we are doing."  D.E. 81 ¶ 48.  Although Maraia did not name Plaintiffs as the " 3 or 4

members" to which he referred, Maraia told the assembled union members:

> Remember  you have to live up to the IBEW Constitution and use the remedies in
> that book.  There is a procedure you must follow.  You will be brought up on
> charges.  I have fought too hard for these jobs that we are getting to have a few
> assholes screw it up.  Let me tell you this – some of the work you are complaining
> about is not yet completed so when you run and tell the owner and or the GC that the
> work is being installed incorrectly, you better be right.  We are in terrible times – no
> work, anti-union sentiment –and I am fighting all these fights and will continue.  And
> do not be mistaken, I will fight the few members who are trying to hurt this
> organization.  I will use everything in the CBA, Constitution and By-Laws to stop
> this vendetta.

Id.

According to Kazolias, Maraia also stated at the meeting that "these three guys will never

work in the territory again."  Id.  Maraia claims he never referred to the plaintiffs as assholes or

stated they would never work in the region again.  Id.

In May 2009, each Plaintiff filed an EEOC charge against at least one of the defendants. On May 1, 2009, Plaintiff Swingle filed EEOC charges of age discrimination and retaliation against the union and Lightmore. D.E. 70 ¶ 42; D.E. 81 ¶ 42. On or about May 6, 2009, Plaintiff Roxby filed a second EEOC charge against the union in which he claimed that the union had retaliated against him for having previously filed discrimination charges by having him fired from two jobs in the summer and fall of 2008. He also described Maraia's statements at the February 2009 union meeting as being directed towards those individuals who had previously filed complaints against the union. D.E. 70 ¶ 45; D.E. 81 ¶ 45; McGovern Aff. Ex. 16, D.E. 75-34. On or about May 19, 2009, Kazolias also filed an EEOC charge against the union in which he alleged that Maraia's comments at the February 2009 union meeting constituted retaliation against him by the union for his having filed discrimination charges. See McGovern Aff. Ex. 17, D.E. 75-35.

On May 18, 2009, the EEOC notified Kazolias and Roxby that the Commission was closing its cases related to the retaliation and age-discrimination charges they had filed on September 15, 2008, but that they could sue under the ADEA within ninety days of receipt of the notice. See D.E. 39-1 at 23 - 24, 26 - 27. The EEOC also told Swingle that the Commission was closing his case because his charges had not been timely filed. See D.E. 39-1 at 29.

On May 26, 2009, the union held another monthly meeting at which Maraia announced that the members (who were not named) who were "suing our Local over the referral system and now over . . . age discrimination" had "failed to tell these agencies . . . that all of them were asked if they wanted to go back to the job and all of them refused me." Felix Decl. Ex. U, D.E. 80-30, at 1. Maraia informed the members that the EEOC had "dismissed and closed the case." Id.

8

In July 2009, Kazolias became President of the union.  D.E. 70 ¶ 82.

On July 8, 2009, Plaintiff Swingle filed a second EEOC charge alleging age discrimination and retaliation by the union for his having filed his earlier EEOC charge. McGovern Aff. Ex. 18, D.E. 75-36.  He stated that Maraia had referred to him and the other plaintiffs as "assholes" who would "never work in this local again!," and that he was being improperly passed over for job referrals.  Id.  The EEOC issued Swingle a notice of right to sue on July 22, 2009.  D.E. 39-1 at 31.  That month, the EEOC also issued Kazolias and Roxby additional right-to-sue letters on the EEOC charges they had filed on May.  D.E. 39-1 at 25, 28.

On August 17, 2009, Plaintiffs commenced this suit against the union, Maraia, Lightmore, and Popik.  D.E. 1.

At some point in 2010, Kazolias was removed by Maraia from his position as trustee of the union's Benefits Fund.  See D.E. 81 ¶ 83.  Kazolias and Maraia engaged in other disputes during Kazolias's presidency which are described more fully herein.  See id.

On August 25, 2010, Plaintiffs filed their Amended Complaint, D.E. 39.

In their submissions on this motion, both parties refer to the following additional events which took place after the filing of the Amended Complaint.  First, Plaintiffs challenge referrals which occurred after the date of filing.  Second, on November 23, 2010, Plaintiff Roxby was referred by the union to a job for Travis, Inc. at the Pfizer jobsite in Pearl River, New York. D.E. 81 ¶ 52.  Roxby was initially referred as a journeyman electrician for a job that was to last only two days.  See D.E. 80-31 at 1.  Travis requested to have Roxby come back, and Roxby was referred again to the job from November 29, 2010, to December 3, 2010, still as a journeyman electrician.  See id.  Roxby was promoted to night foreman at Travis, Inc., on December 6, 2010, but was terminated on December 9, 2010.  See id. at 2.  On Roxby's termination notice, Roxby's

supervisor, General Foreman Michael Rafferty, stated that the reasons for Roxby's termination were 1) being a half an hour late to work on December 6, 2010; 2) that he was "not qualified," and 3) that he "refuses to work as directed."  McGovern Aff. Ex. 20, D.E. 75-38, at 7.

Upon receiving the termination notice from Rafferty when he arrived at work on December 9, 2010, Roxby contacted Sam Fratto, the Senior Assistant Business Manager of Local 363.  McGovern Aff. Ex. 20, D.E. 75-39, at 10.  Fratto investigated Roxby's termination. D.E. 70 ¶ 54.  After interviewing Roxby and Rafferty, Fratto advised Roxby that "there is a disagreement between both parties in regard to the issues involving your termination," and asked Roxby if he wished to file a grievance.  See D.E. 75-39 at 10.  Roxby did so, alleging in his grievance that he was wrongfully terminated, and requesting reinstatement, that his record be expunged, and back pay.  See id. at 12.  Fratto advised Roxby that in order to counteract Travis, Inc.'s, claim that Roxby was "unqualified," Roxby needed to re-take the journeyman wireman exam, and that a Labor Management Committee meeting would be convened to adjudicate the grievance.[3]  See id. at 14.  Roxby declined to re-take the exam, stating that his prior education and testing should have been enough to demonstrate his qualifications.  See id. at 16.  Roxby also requested to be present at the meeting, but although he was advised of its occurrence and provided with a copy of the minutes, he was not invited to attend.  D.E. 81 ¶¶ 60 - 62.

In January 2011, the Labor Management Committee determined that Travis, Inc., was justified in terminating Roxby for lack of qualifications and failure to work as directed, but not for absenteeism.  D.E. 81 ¶ 62.  Shortly thereafter, Roxby was told by Maraia that he needed to

---

[3]Section 1.05 of the CBA establishes a Labor Management Committee made up of three union representatives and three management representatives.  If the union and an employer are unable to resolve a union member's grievance within forty-eight hours, the Committee adjudicates the grievance.  See D.E. 76-1 at 3-4.

appear before the union's Executive Board before he could re-sign the referral list.  McGovern

Aff. Ex. 20, D.E. 75-40, at 16.  Prior to his appearance before the Executive Board, on February

3, 2011, Roxby filed a complaint against the union with the NLRB, alleging that the union had

caused Travis, Inc., to terminate him.  McGovern Aff. Ex. 19, D.E. 75-37.  In March 2011,

Roxby amended his NLRB complaint to include the claim that the union had prevented him from

signing the referral list for "discriminatory, arbitrary, or invidious reasons."  See id.  Via letter

dated April 19, 2011, the NLRB dismissed Roxby's complaint.  McGovern Aff. Ex. 21, D.E. 75-

41, at 1.  Roxby appealed, but his appeal was denied via letter dated June 7, 2011.  D.E. 81 ¶ 70;

see also McGovern Aff. Ex. 22, D.E. 75-42.

Roxby met with the Executive Board on April 12, 2011.  See McGovern Aff. Ex. 26,

D.E. 75-46.  Following the meeting, the Board demoted Roxby from journeyman electrician to

third-year apprentice, and directed him to attend additional classes prior to re-taking the

journeyman's qualification test.  See id.; see also D.E. 70 ¶ 65.

Plaintiff Kazolias also filed charges against the union with the NLRB during the winter

of 2010-11.  D.E. 70 ¶ 78; D.E. 81 ¶ 78; see also McGovern Aff. Ex. 23, D.E. 75-43.  Kazolias

claimed that the union had engaged in unfair labor practices by "referring him to work when he

already had an assignment for reasons that are arbitrary, discriminatory, and invidious."  D.E.

75-43.  In his amended NLRB complaint filed that March, Kazolias clarified that the referrals to

which he objected had occurred when he was already working on assignments outside the

union's jurisdiction.  See id.  In April 2011, the NLRB dismissed his charges.  McGovern Aff.

Ex. 24, D.E. 75-44.

## IV.  Plaintiffs' Challenged Job Referrals

Each plaintiff prepared a list of those referrals he believed he had been denied for

retaliatory reasons, from February 2008 to early 2011. See Felix Decl. Ex. SS, D.E. 80-52 (Kazolias's list of challenged referrals); Olivieri Aff. Ex. H, D.E. 76-11 (Roxby's list of challenged referrals); Olivieri Aff. Ex. I, D.E. 76-12 (Swingle's list of challenged referrals). Kazolias has challenged over one hundred referrals; Roxby has challenged forty-two; and Swingle has challenged eighty. Olivieri Aff., D.E. 76, at 5-6. The referral lists prepared by Plaintiffs consist of those instances they identified on the referral lists in which another job applicant with a higher number on the list (that is, someone who had been out of work for less time) was referred to a job before they were. Plaintiffs provide the names of those individuals they claim were improperly referred, the dates of the challenged referrals, and, in some instances, Bates stamp numbers corresponding to that portion of the referral list containing the challenged referral.

The union does not dispute that individuals with higher numbers on the referral list than Plaintiffs received the challenged job referrals. The union contends, however, that all the challenged referrals were made pursuant to the exceptions to the chronological referral order rule listed above. See D.E. 70 ¶¶ 85-92; Olivieri Aff. Ex. J - L, D.E. 76-13 - D.E. 76-34. In support of this contention, the union's referral agent, Rosario Olivieri, affirms that he compared the challenged referrals with the union's records and then tabulated the union's list of explanations for the jumps. See D.E. 76.

In response to Defendants' assertions, Plaintiffs deny knowledge or information sufficient to determine their truth, cite Swingle's affidavit as a partial response, and move to reopen discovery to permit them to depose Olivieri. See D.E. 81 ¶¶ 85 - 92. Much of Swingle's affidavit is argument: he believes the additional written referral rules promulgated by the union are invalid because the only referral rules the union may use are those in the CBA, see Swingle

Aff., D.E. 82, at 3 - 4, and furthermore, that the specialties the union recognizes are not legitimate job requirements, see id. at 8.   However, Swingle also provides facts within his personal knowledge: he indicates that he and the other plaintiffs, while still *pro se*, were not provided with the supplemental documentation the union used to establish its non-retaliatory motives, see id. at 25 - 26, and also refutes certain reasons the union provides for passing him over for certain referrals, see id. at 28 - 33.   Neither Kazolias nor Swingle submitted a similar affidavit.   However, as discussed further herein, some of the supporting documentation supplied by the union contradicts the reasons asserted by Olivieri for the challenged referrals.

## DISCUSSION

### I.  Standard for Summary Judgment

Under Rule 56, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 320-23 (1986).

> Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement may constitute grounds for denial of the motion.

Local Civ. R. 56.1(a).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law.  See Anderson, 477 U.S. at 250.  The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a

finder of fact.  Id.   A dispute over a material fact is one "that might affect the outcome of the

suit under the governing law."  See id. at 248.  Parties may support their version of material facts

by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information,
> affidavits or declarations, stipulations (including those made for
> purposes of the motion only), admissions, interrogatory answers,
> or other materials; or
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot
> produce admissible evidence to support the fact.

Fed. R. Civ. Proc. 56(c)(1).

Under Local Rule 56.1(b), the papers opposing a motion for summary judgment shall

include a correspondingly numbered paragraph responding to each numbered paragraph in the

statement of the moving party, and if necessary, additional paragraphs containing a separate,

short, and concise statement of additional material facts as to which it is contended that there

exists a genuine issue to be tried.  Local Civ. R. 56.1(b).  Summary judgment may be granted

only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an

essential element of [its] case with respect to which [it] has the burden of proof.' "  Berger v.

United States, 87 F.3d 60, 65 (2d Cir. 1996) (quoting Celotex, 477 U.S. at 323) (alteration in

original).  If the party opposing summary judgment does not respond to the motion, the court

may "grant summary judgment if the motion and supporting materials--including the facts

considered undisputed--show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

However, even where the nonmoving party fails to respond to a motion for summary judgment,

the court

> may not grant the motion without first examining the moving party's

14

> submission to determine if it has met its burden of demonstrating that no
> material issue of fact remains for trial.  If the evidence submitted in
> support of the summary judgment motion does not meet the movant's
> burden of production, then summary judgment must be denied *even if no
> opposing evidentiary matter is presented.*

D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (quoting Vt. Teddy Bear Co. v.

1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004)) (emphasis in original).

Moreover, a court should "constru[e] the evidence in the light most favorable to the

nonmoving party and draw[] all reasonable inferences in its favor." Mount Vernon Fire Ins. Co.

v. Belize NY, Inc., 277 F.3d 232, 236 (2d Cir. 2002); Farias v. Instructional Sys., Inc., 259 F.3d

91, 97 (2d Cir. 2001); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998); see

also Anderson, 477 U.S. at 261 n.2.  Thus, "[o]nly when no reasonable trier of fact could find in

favor of the nonmoving party should summary judgment be granted." Cruden v. Bank of New

York, 957 F.2d 961, 975 (2d Cir. 1992) (quoting H.L. Hayden Co. v. Siemans Med. Sys. Inc.,

879 F.2d 1005, 1011 (2d Cir. 1989)).

## II.  Plaintiffs' Duty of Fair Representation Claims

### A.  Plaintiffs' Lightmore-Related Hybrid Duty of Fair Representation Claims

Plaintiffs devote most of their Amended Complaint to allegations that Lightmore violated

various provisions of the CBA, and that the Union mis-handled their Lightmore-related

grievances.  See D.E. 39 ¶¶ 21 - 112.  A claim against an employer for breach of the CBA and a

duty of fair representation ("DFR") claim against the union for its handling of grievances arising

from the employer's breach is considered a hybrid § 301 claim under the LMRA, 29 U.S.C. §

185.  See McKee v. Transco Products, Inc., 874 F.2d 83, 86 (2d Cir. 1989)("regardless of who is

named as a defendant, a hybrid claim is presented if an employee has a cause of action against

both the employer and the union, where the two claims are inextricably linked, and where the

case to be proved is the same against both").   The statute of limitations is six months for hybrid claims against either the employer or the union.   DelCostello v. Intern. Broth. of Teamsters, 462 U.S. 151, 163 (1983).  A hybrid § 301 claim accrues "no later than the time when plaintiffs knew or reasonably should have known that such a breach [of the duty of fair representation] had occurred."  Santos v. District Council of New York City et al., 619 F.2d 963, 969 (2d Cir. 1980).

Here, Plaintiffs knew or reasonably should have known that the union had reached an unsatisfactory resolution of their grievances against Lightmore when they received a copy of Popik's letter describing Lightmore's compliance with the resolution reached with Maraia in March 2008, see McGovern Aff. Ex. 25, D.E. 75-45, D.E. 70 ¶ 34.[4]  Plaintiffs filed this action in August 2009.  Thus I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's Lightmore-related duty of fair representation claims be dismissed as time-barred.[5]

### B.  Plaintiffs' Job Referral-Related Duty of Fair Representation Claims

Plaintiffs also allege that the union has violated its duty of fair representation toward them since they first filed their grievances against Lightmore by repeatedly passing them over for job referrals for retaliatory reasons.  I do not construe Plaintiffs' claims that, since 2008, the union has retaliated against them by denying them job referrals, as hybrid § 301 claims, because the job referral procedure is an internal union matter and does not directly invoke the union's role as the representative of a member to an employer.

---

[4]Plaintiffs do not dispute that the letters were mailed to them, nor do they suggest they were not received.  See D.E. 81 ¶ 34.

[5]Although Plaintiffs appear to argue that their Lightmore-related duty of fair representation claim should not be time-barred as it marks the beginning of a continuing violation of the duty of fair representation, this argument is not supported by Second Circuit case law, as I discuss in Section II.B.2, infra.

1. *The Duty of Fair Representation*

All unions certified under the National Labor Relations Act owe their members a duty of fair representation.  See Vaca v. Sipes,  386 U.S. 171, 177 (1967).  This duty is an implied "statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct."  Id. (citing Humphrey v. Moore, 375 U.S. 335, 342, 367 (1964)).  A union member "may bring a [duty of fair representation] claim . . . against the union based on its wrongful refusal to refer him for work."  See Breininger v. Sheet Metal Workers Intern. Ass'n Local Union No. 6, 493 U.S. 67, 82 (1989). In order to make out a claim that a union has violated its duty of fair representation, a plaintiff must establish 1) that the union's actions were arbitrary, discriminatory, or in bad faith, and 2) some "causal connection between the union's wrongful conduct and their injuries." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998).

Courts are to apply a highly deferential standard when evaluating whether a union's actions have violated this duty.  ". . . [A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' . . . as to be irrational." Air Line Pilots Ass'n, Intern. v. O'Neill, 499 U.S. 65, 67 (1991).  Discrimination in violation of the duty of fair representation must be shown through "substantial evidence" and must be "intentional, severe, and unrelated to legitimate union objectives." Amalgamated Ass'n of St., Elec. Ry. v. Motor Coach Emp. of America v. Lockridge, 403 U.S. 274, 301 (1971).  "Bad faith encompasses fraud, dishonesty, and other intentionally misleading conduct." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998).

17

2. *The Statute of Limitations for Duty of Fair Representation Claims*

In this Circuit, courts have held that the statute of limitations for all duty of fair representation claims is six months.  See Eatz v. DME Unit of Local Union No. 3 of I.B.E.W., 794 F.2d 29, 33 (2d Cir. 1986)("We read DelCostello to require that the § 10(b) six-month limitations period also be applied to unfair representation claims standing alone"); see also Bey v. I.B.E.W. Local Union No. 3, No. 05 Civ. 7910(JSR), 2008 WL 821862, at *15 (S.D.N.Y. March 26, 2008); Waterman v. Transport Workers' Union Local 100, 8 F.Supp.2d 363, 368 (S.D.N.Y. 1998).  As noted above, "a cause of action based on the duty of fair representation accrues when the union members know or reasonably should know that a breach of that duty has occurred."  Eatz, 794 F.2d at 33.

Plaintiffs seek to escape the six-month statute of limitations, however, by arguing that the union's repeated failures to refer them to jobs constitute a continuing violation, tolling the limitations period.  D.E. 83 at 5-6, 41.  Under this theory, Plaintiffs contend that even their Lightmore-related duty of fair representation claim should not be time-barred.  In support of this argument, Plaintiffs cite the Supreme Court's decision in Local Lodge No. 1424 v. N.L.R.B., 362 U.S. 411, 416 (1960), in which the Court described the use of unfair labor practices occurring outside the six-month statute of limitations in N.L.R.A. § 10(b), 29 U.S.C. § 160, as evidence.  The Court stated, and Plaintiff quotes in part, the following:

> It is doubtless true that s 10(b) does not prevent all use of evidence relating to events transpiring more than six months before the filing and service of an unfair labor practice charge. However, in applying rules of evidence as to the admissibility of past events, due regard for the purposes of s 10(b) requires that two different kinds of situations be distinguished. The first is one where occurrences within the six-month limitations period in and of themselves may constitute, as a substantive matter, unfair labor practices. There, earlier events may be utilized to shed light on the true character of matters occurring within the limitations period; and for that purpose s 10(b) ordinarily does not bar such

18

> evidentiary use of anterior events. The second situation is that where conduct
> occurring within the limitations period can be charged to be an unfair labor
> practice only through reliance on an earlier unfair labor practice. There the use of
> the earlier unfair labor practice is not merely 'evidentiary,' since it does not
> simply lay bare a putative current unfair labor practice. Rather, it serves to cloak
> with illegality that which was otherwise lawful. And where a complaint based
> upon that earlier event is time-barred, to permit the event itself to be so used in
> effect results in reviving a legally defunct unfair labor practice.

362 U.S. 411, 416-17.

The Court went on to hold that because the complaint at issue fell within the second

category, it was time-barred.  362 U.S. at 424.

Plaintiffs state, without further elaboration, that this holding supports a theory of a

continuing violation of the duty of fair representation.  D.E. 83 at 32.  However, it is unclear how

this holding could permit Plaintiffs to revive time-barred claims.  If Plaintiffs intend to argue that

their allegations fall under the first situation described in the block quote, that is, that those job

referral denials which occurred within the statute of limitations period are themselves duty of

fair representation violations, then the Court's holding suggests only that *evidence* of time-barred

job referral denials and of the 2008 grievances filed against Lightmore may be admissible to

illuminate the timely claims.  The time-barred claims are not revived, or incorporated as part of a

continuing violation, simply because they may be introduced to place the timely claims into

context.  Alternatively, if Plaintiffs' claims fall into the second category described in the block

quote, that is, that allegedly retaliatory job referral denials which occurred within the six-month

period are only unlawful when considered in light of evidence of earlier violations, then like the

complainants in Local Lodge No. 1424, all claims would be time-barred.  The Court's holding in

Local Lodge, therefore, does not establish that a continuing violation theory should apply to duty

of fair representation claims in this context.

19

Plaintiffs also rely on several cases outside this Circuit in which courts have recognized continuing violations of the duty of fair representation. D.E. 83 at 31-32. Plaintiffs first cite Burkholder v. International Union, Unit. Auto Aerospace and Agr. Implement Workers of America, Local No. 12, 700 F.Supp.2d 895 (N.D. Ohio 2010), *aff'd*, Bowerman v. International Union, Unit. Auto Aerospace and Agr. Implement Workers of America, Local No. 12, 646 F.3d 360 (6th Cir. 2011). Burkholder can only carry persuasive, not precedential, weight, here, and while that court did find that the continuing violation doctrine used in the employment discrimination context could apply to duty of fair representation claims, it held that the doctrine did not apply on the facts of that case–facts which are similar to Plaintiffs' here.[6]

Plaintiffs also cite Lewis v. Local Union No. 100 of Laborers' Intern. Union of North America, AFL-CIO, 750 F.2d 1368 (7th Cir. 1984), in support of their contention that the continuing violation theory of employment discrimination law should apply in the context of a duty of fair representation claim. D.E. 83 at 32. In Lewis, the plaintiff, a member of a union which operated an exclusive hiring hall, was repeatedly denied job referrals because of a "personal dispute" with union leadership from February 1980 to June 1982. 750 F.2d at 1371. Lewis filed his original complaint on March 23, 1982 and an amended complaint in July 1983. Id. at 1378. Because he had alleged a continuing pattern of discriminatory conduct, namely, the

---

[6]In Burkholder, the plaintiffs, machine repair workers at a Toledo Jeep plant, alleged that their local union had continuously violated its duty of fair representation by repeatedly giving work assignments to more skilled workers, instead of to them. 700 F.Supp. at 898, 904-05. That court found that although a continuing violation theory *could* apply to duty of fair representation claims, it did not apply in Burkholder because the challenged work assignment decisions constituted "discrete allegedly wrongful actions." Id. at 905 (citing National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)(such discrete, easily identifiable acts, even when serially repeated, cannot constitute a continuing violation of Title VII)).

repeated job referral denials, the Seventh Circuit held that the six-month statute of limitations was tolled under the continuing violation doctrine. Id. at 1377-80.

However, Lewis predates the Supreme Court's decision in Morgan. In Morgan, the Court rejected the theory that, in the context of Title VII, a continuing pattern of discrete but related discriminatory acts could toll the statute of limitations so long as one act fell within the limitations period, the rationale articulated by the Seventh Circuit in Lewis. See Morgan, 536 U.S. at 113-15. As the Sixth Circuit noted in Bowerman, the Supreme Court's decision in Morgan appears to diminish the continued persuasive value of Lewis. Bowerman, 646 F.3d at 367 n. 5.

I conclude, therefore, that no continuing violation theory applies to Plaintiffs' duty of fair representation claims, and so those of Plaintiffs' duty of fair representation claims which accrued prior to six months before the date their original complaint was filed are time-barred. Even if I were to apply a continuing violation theory from Title VII jurisprudence to the duty of fair representation context, an application this Circuit has yet to recognize, it would not affect my conclusion, since Plaintiffs' claims consist of discrete but repeated violations of the duty of fair representation since the initial mis-handling of their grievances in 2008.[7] Under Morgan, such

_____

[7]In their *pro se* Amended Complaint, Plaintiffs included "Hostile Work Environment" in their list of claims. See D.E. 39 at 1, 38. They also stated that "LU 363 B.A. John Maraia, and His LU 363 Administration, and all their violations of the Plaintiffs rights have created an unjust 'Hostile Enviorment' [sic]" through Maraia's retaliatory acts. D.E. 39 at 39, ¶ 131. A Title VII hostile work environment claim, under Morgan, *would* toll the applicable statute of limitations under a continuing violation theory. See Morgan, 536 U.S. at 114. However, I apply a more straightforward construction of this portion of their Amended Complaint as stating a hostile work environment claim under either Title VII or the ADEA. Plaintiffs' opposition papers here, submitted through counsel, confirm this construction. Plaintiffs do not argue that their duty of fair representation claims should be analogized to hostile work environment claims under Title VII, and compare their case to Lewis, in which a continuous pattern of discrete but related instances of discriminatory conduct was found by the Seventh Circuit to be part of a continuing

claims cannot constitute a continuing violation for the purposes of tolling the statute of limitations.

Having determined that the six months statute of limitations is not tolled, the question then becomes when Plaintiffs' various duty of fair representation claims accrued.  "A cause of action based on the duty of fair representation accrues when the union members know or reasonably should know that a breach of that duty has occurred." Eatz, 794 F.2d at 33.

The date on which Plaintiffs' job referral-related duty of fair representation claims accrued is more difficult to determine than that of their Lightmore-related duty of fair representation claims, since the facts presented do not establish precisely when Plaintiffs became aware that they had been passed over for a job referral.  Roxby cited the retaliatory referral jumps in his June 4, 2008, NLRB complaint, see McGovern Aff. Ex. 10, D.E. 75-28, indicating that he was aware of "being jumped" on the referral list within a few months of the commencement of the alleged retaliation, but a more specific time frame is not available on the facts provided.  Thus I presume that Plaintiffs could reasonably become aware of challenged referrals on or about the date they occurred.  Therefore, I conclude that any duty of fair representation claims arising prior to six months before the complaint was filed, or on or about February 17, 2009, are time barred.  I also decline to consider any duty of fair representation claims which arose after the filing of the Amended Complaint on August 25, 2010, because they were raised for the first time on summary judgment.  Thus I will consider, as potential duty of fair representation claims, instances of alleged discrimination or retaliation which occurred between February 17, 2009, and August 25, 2010.

———————————————

violation.

### 3. *Kazolias's Duty of Fair Representation Claims*

Plaintiff Kazolias identifies twenty-seven challenged referrals within this time period, each of which represents an alleged violation of the union's duty of fair representation. In addition, he alleges that Maraia retaliated against him while he served as union president in a number of ways. First, Maraia prevented him from appointing committee members, see McGovern Aff. Ex. 2, D.E. 75-11, at 399; second, Maraia permitted office staff to use a signature stamp to sign checks, id. at 444; third, Maraia removed Kazolias as a trustee of the union's benefit funds, id. at 438; fourth, Maraia asked Kazolias to resign as President, id. at 428; fifth, Maraia permitted office staff to open Kazolias's official mail, id. at 436; sixth, Maraia threatened to bring charges against Kazolias if he conducted union business without Maraia, id. at 423; and seventh, Kazolias claims that Maraia retaliated against Kazolias by ensuring that Kazolias lost his reelection bid as chairman of the union's Executive Board, see id. at 400: 1-14.

### a. *Kazolias's Job Referral-Related Duty of Fair Representation Claims*

The union contends that each challenged referral was made in accordance with established referral procedures. However, some evidence presented by the union conflicts with the union's asserted rationales as to two challenged referrals. First, on November 18, 2009, John Kelly (then number 156 on the referral list[8]) was referred to a job before Kazolias was ( then number 99[9]). D.E. 76-13 at 2. Olivieri affirms that this referral was not improper because the

---

[8] Kazolias and Olivieri list Kelly as number 156, see D.E. 80-52, D.E. 76-13, but on the relevant portion of the referral list provided by the union in support of its rationale for the challenged referral, Kelly is number 159. Olivieri Aff. Ex. J, D.E. 76-18, at 5 - 7.

[9] Again, Kazolias lists himself as #99 at this time, but Olivieri and the referral list have him as #102. The discrepancy does not change the fact that Kazolias was skipped over by someone with a higher number on the list.

job required a "CDL" (commercial driver's license, the Court assumes) and familiarity with the contractor's trucks, which Kelly ostensibly possessed and Kazolias did not. D.E. 76-18 at 5 - 7. However, in the referenced exhibit to Olivieri's affirmation, Olivieri does not provide any documentation beyond the referral list printout for the relevant date. See id.. The referral list does not indicate that a commercial driver's license was required for the job. Indeed, according to the list of Kazolias's specialties provided by the Union, D.E. 76-35, Kazolias *has* a commercial license, so unless the union could show Kazolias was not familiar with the trucks the contractor used, it appears that Kazolias *would* have been qualified for this job. Because Kazolias has adduced evidence of retaliatory animus towards him in the form of repeated negative comments by Maraia and other union officers concerning this suit, and the evidence in support of the union's proffered non-retaliatory reason for the challenged referral is contradictory, a genuine issue of material fact remains as to why Kazolias was denied this job referral. I conclude, and respectfully recommend that Your Honor should conclude, that summary judgment is inappropriate on this claim.

Second, Kazolias indicates on his list of challenged referrals that another applicant, Bill Buckman, was referred to a job on March 2, 2010, although Buckman had a higher referral number than Kazolias. D.E. 80-52 at 6. In his list of challenged referrals, Kazolias references a Bates stamp number corresponding to the document which contains Buckman's March 2, 2010 referral–a document which simply does not appear in the union's submissions. See id. Defendants have apparently failed to respond to this claim. As noted before, Kazolias has provided some evidence of the union's retaliatory animus towards him. However, Olivieri affirms that all Plaintiffs' challenged referrals were made in accordance with referral procedures. Thus there exists, with respect to this claim, a genuine dispute over why Kazolias was denied

this referral, and I conclude, and respectfully recommend that Your Honor should conclude, that summary judgment should be denied on this claim.

On the remainder of Kazolias's challenged referrals, the union has provided non-retaliatory reasons for denying Kazolias those jobs. Kazolias has supplied no evidence to rebut these assertions. Thus I conclude, and respectfully recommend that Your Honor should conclude, that summary judgment should be granted with respect to the twenty-five remaining challenged referrals within the relevant time period.

b. *Kazolias's Presidency-Related Duty of Fair Representation Claims*

To the extent that any actions interfering with Kazolias's presidential duties, which are unrelated to his rights as a union member, may constitute a violation of the union's duty of fair representation, Kazolias has not provided "substantial evidence" that Maraia's actions against him were "intentional, severe, and unrelated to legitimate union objectives." Amalgamated Ass'n of St., Elec. Ry. v. Motor Coach Emp. of America v. Lockridge, 403 U.S. 274, 301 (1971). Kazolias's first claim rests solely on his deposition testimony that Maraia appoints committees with little or no input from Kazolias. See Felix Decl. Ex. D-2, D.E. 80-6, at 399. Maraia's deposition testimony contradicts Kazolias's assertion. See Felix Decl. Ex. E, D.E. 80-8, at 70:3, 71:1-3. Although the IBEW Constitution states that the President "shall appoint all committees," it also states that he or she shall "consult and cooperate with the business manager . . . on all appointments," see Felix Decl. Ex. A, D.E. 80-1, at 53. Furthermore, the Constitution makes clear that the Business Manager is the primary officer of the union, and that all other officers "shall not work in conflict with him." Id. at 48.

Kazolias has thus not provided substantial evidence that the union discriminated against him by interfering with his ability to appoint committee members, nor has he established that

this interference is sufficiently severe so as to constitute a duty of fair representation violation. Therefore, I conclude that this claim cannot serve as a basis for a DFR violation.

I conclude that Kazolias's second claim should be dismissed for the same reasons: Kazolias has failed to provide substantial evidence that Maraia's dispute concerning which checks required membership approval and which could be rubber-stamped was motivated by retaliatory intent, or was sufficiently severe so as to constitute a violation of the duty of fair representation. Kazolias's claim here rests on his deposition testimony, which is contradicted by Maraia's, to establish that the union acted adversely to his interests, and has provided only circumstantial evidence of the union's retaliatory animus. Moreover, Kazolias has not established that Maraia's disagreement with him was unrelated to legitimate union objectives. Thus I conclude that Plaintiff cannot sustain this DFR clam.

Kazolias's claim against the union relating to his removal as benefits funds trustee fails under this rationale as well. Kazolias has not provided substantial evidence that Maraia's decision to remove him as trustee was based on intentional retaliation for his dissidence or that it was unrelated to union objectives. Article XVIII, Section 8, of the IBEW International Constitution states that the Business Manager or his designee is the trustee of such funds, see D.E. 80-1 at 57, and Article XVII, Section 2, states that the Business Manager has sole authority to appoint or remove his assistants and representatives, see id. at 48. Kazolias has provided evidence of general hostility towards him for commencing this suit and engaging in other concerted activity, but he has not linked that animosity to his removal from this position. Nor does removal from an appointed union position compare in severity with the denial of job opportunities. Such circumstantial evidence is insufficient to satisfy a plaintiff's heavy burden in making out a violation of the duty of fair representation, given the "highly deferential" standard

courts have adopted.  See Air Line Pilots Ass'n, Intern. v. O'Neill, 499 U.S. 65, 78 (1991).

Kazolias's fourth, fifth, and sixth claims do not constitute actions of sufficient severity to constitute violations of the union's duty of fair representation, so they fail on that basis.   As to Kazolias's seventh claim, he has provided no evidence whatsoever that Maraia engineered the outcome of the chairmanship election, so I recommend that this claim be dismissed.

Thus I conclude, and respectfully recommend that Your Honor should conclude, that Kazolias's allegations of violations of the duty of fair representation arising from his presidency fail as a matter of law, and should be dismissed.

### 4.  *Swingle's Duty of Fair Representation Claims*

Of the challenged referral jumps on Swingle's list, none fall within the relevant date range.  Swingle appears to only have identified referral jumps in 2008, which are time-barred, or 2011, which were not properly pled.  See generally Felix Decl. Ex. TT, D.E. 80-53.  Thus, Plaintiff Swingle cannot make out DFR violations based on his challenged job referrals.

The only additional DFR claim raised by Swingle which falls within the appropriate date range relates to negative comments made by a union representative, Sam Fratto, about the pace of his work while Swingle was working for Sausto Electric on December 28, 2009.  See D.E. 81 ¶ 71.  Fratto stated that he was responding to the employer's complaints about Swingle's work.  See D.E. 70 ¶ 73.   According to Swingle, Fratto explained that he was concerned about the way Swingle and another journeyman referred through the union to the job were reflecting on the union.  McGovern Aff. Ex. 4, D.E. 75-17, at 132 - 34.  Swingle has not produced evidence to suggest that this motivation was pretextual, and Swingle did not lose his job with Sausto or identify any negative consequences aside from being the recipient of a negative comment.  Thus he has failed to establish that the actions undertaken by the union were severe or that the union

acted with retaliatory intent. I respectfully recommend, therefore, that this claim be dismissed.

### 5. *Roxby's Duty of Fair Representation Claims*

Twelve of Roxby's challenged referrals fall within the requisite date range. However, Roxby has failed to adduce "substantial evidence" that the union acted with the intent to discriminate against him, and not for the legitimate reasons the union has provided. Nor does any conflicting evidence arise in the supporting documentation the union has provided with respect to these dates. Thus I conclude, and respectfully recommend that Your Honor should conclude, that Roxby's DFR claims should be dismissed.

Although Roxby alleged three additional DFR violations related to the union's handling of his termination from several jobs, the terminations occurred in 2008 and November 2010, outside the relevant time period for these claims. Roxby alleges that the union induced J&J Sass Electric to fire him on August 7, 2008; that the union failed to adequately represent him on his termination from Filingeri Electrical on August 25, 2008; and that the union failed to represent him in his termination from Travis Electric on December 9, 2010, and again when it demoted him to apprentice.[10] Thus I conclude that summary judgment be granted on these claims.

### C. Plaintiffs' Duty of Fair Representation Claims against Defendant Maraia

To the extent that Plaintiffs assert DFR violations against Maraia, I conclude, and respectfully recommend that Your Honor should conclude, that those claims should be dismissed, as this Circuit has held that individual union agents are immune from DFR claims. See Morris v. Local 819, Intern. Broth. of Teamsters, 169 F.3d 782, 784 (2d Cir. 1999).

---

[10]Even if this claim had been properly pled, I would still recommend that summary judgment be granted because Roxby has not demonstrated that the union acted with retaliatory intent, and not in furtherance of legitimate union objectives. See Section III.E, *infra*.

### III.  Plaintiffs' LMRDA Claims

Plaintiffs allege that the union violated their rights under the Labor-Management Reporting and Disclosure Act of 1959 (herein, "LMRDA") by denying them equal access to job referrals because they filed complaints with the NLRB, the EEOC, and this suit.  See D.E. 83 at 10-11.  Plaintiffs claim that this alleged retaliation violated Sections 101 (a)(1) and (2) of the LMRDA.  See id. at 12-13 (citing 29 U.S.C. §§ 411(a)(1) and (2)).  In addition, Plaintiff Roxby claims for the first time in his submissions in opposition to this motion that the union improperly disciplined him in violation of Section 609 of the LMRDA, 29 U.S.C. § 529, when it demoted him to apprentice in January 2011.  See D.E. 83 at 15.  Plaintiff Kazolias also asserts that his removal as benefits fund trustee was an act of retaliation prohibited by the LMRDA, and that this removal chilled all union members' free speech rights.  See id. at 19 n. 2.

#### A.  The LMRDA

Title I of the LMRDA, 29 U.S.C. § 411 et seq., the "Bill of Rights" for labor unions, protects union members' equal rights to participate in union self-governance, see § 101(a)(1), 29 U.S.C. § 411 (a)(1); their freedom to assemble and to voice "any views, arguments, or opinions" related to union matters, § 101(a)(2), 29 U.S.C. § 411 (a)(2); and from being disciplined without certain procedural due process safeguards, see § 101(a)(5), 29 U.S.C. § 411 (a)(5).  Section 609 of the LMRDA also prohibits unions from disciplining members for exercising the rights enumerated in Section 101.  29 U.S.C. § 529.  Section 102 of the LMRDA provides a cause of action for individuals whose Title 1 rights have been infringed.  29 U.S.C. § 412.

"Section 101(a)(2) protects union members from direct interference with union membership rights in retaliation for their expression of opinions concerning union activities." Maddalone v. Local 17, United Broth. of Carpenters and Joiners of America, 152 F.3d 178, 183

(2d Cir. 1998).   Equal access to job referrals is such a membership right.   See Franza v. Intern. Broth. of Teamsters, 869 F.2d 41, 47-48 (2d Cir. 1989) (discussing Murphy v. Intern. Union of Operating Engineers, 774 F.2d 114 (6th Cir. 1985)).   A denial of equal access to jobs because of a union members' dissidence is a violation of both Sections 101(a)(1) and (2).

In contrast, removal from employment with the union will generally not support a Title I claim because such employment is not considered a membership right.   See Finnegan v. Leu, 456 U.S. 431, 441-42 (1982).   However, there are two exceptions to this rule.   First, if the litigant is an elected union official, and is discharged from that position due to his or her dissident speech, he or she can state a claim under Section 102.   See Sheet Metal Workers' Intern. Ass'n v. Lynn, 488 U.S. 347, 355 (1989)(elected union business representative stated a Section 102 claim when he was discharged from his position after he voiced opposition at union meeting to proposed dues increase).   In Lynn, the Supreme Court reasoned that retaliating against an elected official in this way would chill not only the official's free speech rights but also the speech of the members who had voted for him or her, and this chilling effect would directly impede the LMRDA's goal of democratic union self-governance.   Id.

The second exception to the general rule that removal from union employment does not constitute an LMRDA claim occurs when a union member is removed from his or her appointed position but can show by clear and convincing evidence that this removal was the result of a "purposeful and deliberate attempt ... to suppress dissent within the union."   See Maddalone, 152 F.3d at 184 (quoting Schonfeld v. Penza, 477 F.2d 899, 904 (2d Cir. 1973)).   In this situation, the member's removal from appointed office triggers the same concerns with the health of union self-government that motivated the Supreme Court's decision in Lynn.

Courts have discretion over whether to require a plaintiff who alleges a claim under the

LMRDA to first exhaust available intra-union remedies.  See Johnson v. General Motors, 641

F.2d 1075, 1078-79 (2d Cir. 1981).  In determining whether exhaustion of internal union

remedies should be required, a court is to evaluate the following three factors:

> [F]irst, whether union officials are so hostile to the employee that he [or
> she] could not hope to obtain a fair hearing on his [or her] claim; second, whether
> the internal union appeals procedures would be inadequate either to reactivate the
> employee's grievance or to award him [or her] the full relief he seeks under § 301;
> and third, whether exhaustion of internal procedures would unreasonably delay
> the employee's opportunity to obtain a judicial hearing on the merits of his [or
> her] claim.

See Clayton v. International Union, United Auto., Aerospace, and Agr. Implement Workers of

America, 451 U.S. 679, 689 (1981).  The burden of establishing that its internal remedies are

fair, adequate, and reasonable, and that exhaustion should therefore be required, lies with the

union.  See Johnson, 641 F.2d at 1079-80.

The LMRDA statute does not include a limitations period.  Thus, the Court must

determine the limitations period by borrowing from "the most closely analogous state law unless

a federal rule of limitation clearly provides a closer analogy and the federal policies at stake

render the federal limitation a significantly more appropriate vehicle for interstitial lawmaking."

Schermerhorn v. James, No. 96 Civ. 980(JSR), 1997 WL 681345, at * 3 (S.D.N.Y. Oct. 31,

1997).

The LMRDA permits suits against union officials in their individual capacity.

See Guzman v. Bevona, 90 F.3d 641 (2d Cir. 1996)(describing LMRDA suit against local union

and union officers in their individual and official capacities); see also Schermerhorn v. Local

100, Transport Workers Union of America, AFL-CIO, 91 F.3d 316 (2d Cir. 1996).  In order to

make out an LMRDA claim against a union official, a plaintiff must show that the official has

"aid[ed,] abet[ted], instigate[d], or direct[ed] a wrongful use of union power to deprive a member

of his [or her] rights under" Title I.  See Rosario v. Amalgamated Ladies' Garment Cutters'

Union, Local 10, I.L.G.W.U., 605 F.2d 1228, 1246 (2d Cir. 1979).

     B.  Plaintiffs' Job Referral-Related LMRDA Claims

     Courts in this Circuit have held that in order to make out a retaliation-based LMRDA

claim, a plaintiff must show that "(1) [his or] her conduct constituted 'free speech' under the

LMRDA, (2) the speech was the reason the union took action against [him or] her, and (3)

damages."  Green v. Brigham, No. 03 CV 5190(JG), 2005 WL 280327, at * 9 (E.D.N.Y. Feb. 3,

2005)(citing Milne v. Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers,

Local 15, 156 F.Supp.2d 172, 182 (D.Conn. 2001), and Commer v. McEntee, 121 F.Supp.2d

388, 396 (S.D.N.Y. 2000)).  I presume for the sake of this motion, and Defendants do not

contest, that Plaintiffs' NLRB, EEOC, and federal civil complaints constitute "free speech" for

purposes of Title I, as do any comments Kazolias may have made which were critical of referral

procedures during his tenure as President.  See D.E. 83 at 17.  I further assume that Plaintiffs

could demonstrate money damages from the denial of job opportunities.

     Before I evaluate whether a genuine issue of material fact remains as to causation, I must

first determine which job referrals constitute timely LMRDA claims by determining the

appropriate statute of limitations.  Under Reed v. United Transp. Union, 488 U.S. 319 (1989),

courts should apply state general or residual personal injury statute of limitations to LMRDA

claims arising under Section 101(a)(2).  See id. at 323.  The Court reasoned that an action for

violation of the "free speech" rights protected by Section 101(a)(2) is most closely analogous to

a federal civil rights action brought under 42 U.S.C. § 1983, for which the statute of limitations

for state personal injury actions applies.  See id. at 326-27.  This rationale also supports

borrowing from state personal injury statutes in an action for violation of Section 101(a)(1),

which protects union members' equal rights to engage in union democracy. In New York State, the general personal injury statute of limitations is three years. N.Y. C.P.L.R. § 214(5). Thus, I conclude that a three-year statute of limitations applies to Plaintiffs' LMRDA claims here.

The remaining issue with respect to the LMRDA claims arising from their challenged job referrals, then, is whether Plaintiffs have established a causal connection between their protected speech and the denial of job opportunities. For the reasons stated in my analysis of Plaintiffs' referral-related DFR claims, *supra*, I find that Plaintiffs have failed to establish this causal link with respect to all referrals except for Kazolias's challenged referrals on November 18, 2009, and March 2, 2010. Even though all of Plaintiffs' challenged referrals fall within the three-year statute of limitations applicable to Section 101 claims, Plaintiffs provide no evidence of the union's retaliatory intent until Maraia's comments at the February 24, 2009, union meeting. These comments are insufficient evidence of a causal link between Plaintiffs' speech and the denial of job referrals *prior* to this date.

In addition, I find that Plaintiffs should not be required to first exhaust these claims because, to the extent Plaintiffs seek money damages for these claims, the union has not established that its referral appeals committee[11] has the power to compensate Plaintiffs for lost work. The union, therefore, has not met its burden of demonstrating that its internal remedies

---

[11]Article 4, Section 15 of the CBA establishes an appeals committee comprised of one union representative and one management representative, who together appoint a third "public member." See D.E. 80-3 at 24. A union member who wishes to challenge the administration of the referral system may make a complaint to the committee, and the committee's decision is binding on the union. See id. at 24-25. The CBA also gives the committee the power to promulgate "procedural rules for the conduct of its business" but those rules must not substantively alter the appellate process as outlined in the CBA. See id. at 25. The union's additional written referral procedures specify that any such complaints must be made in writing within fifteen days of the challenged referral. See D.E. 76-4 at 5.

are adequate to remedy Plaintiffs complaints.  I therefore conclude, and respectfully request that Your Honor should conclude, that summary judgment should be denied on the LMRDA claims arising from Kazolias's denial of job referrals on November 18, 2009, and March 2, 2010, and granted on all other challenged job referrals.

C.  Kazolias's Additional LMRDA Claim

Kazolias also claims that his removal as benefits trustee constitutes a violation of his Title I rights.  He alleges he was removed from this position in retaliation for his dissident speech, and that this removal was part of a broader, purposeful scheme to suppress dissent. See D.E. 83 at 25.  Kazolias contends that his removal from an appointed position would have a greater chilling effect on union members because he was also serving as union president at the time.  See id. (citing Maddalone, 154 F.3d at 184-85).  That is, Kazolias argues that his removal as benefits trustee falls within the second exception described above to the general rule that removal from appointed office does not constitute a deprivation of membership rights as required for a Section 102 claim.

As a preliminary matter, the union has failed to establish that Kazolias should be required to have exhausted intra-union remedies prior to bringing this claim.   Although the union could have completely remedied Kazolias's injury here by reinstating him to this position, neither the union's by-laws nor the IBEW Constitution make clear what procedure Kazolias could have followed to assert this claim.  Article XIV, Section 1, of the union's by-laws provides that the Executive Board shall act as a trial board over any charges brought by one member against another for violating the IBEW Constitution, the CBA or the by-laws, except when the charged party is an officer or representative of the union.  See D.E. 80-2 at 23.  Article 25, Sections 8 - 11, of the IBEW Constitution state that such charges, when brought against a union

34

representative or officer, will be adjudicated by the International Vice President for the union's region. See D.E. 80-1 at 75-76. Ostensibly, then, if Kazolias intended to bring charges against Maraia for removing him from this position, he could do so before the International Vice President. However, it is unclear what provision of the IBEW Constitution, CBA, or by-laws Maraia violated in removing Kazolias as benefits fund trustee. Thus I decline to require Kazolias to have exhausted intra-union remedies with respect to this claim.

Kazolias's claim here fails on the merits because he has not produced evidence which, if it were believed, would be sufficient to constitute clear and convincing evidence (the evidentiary standard Kazolias would be required to meet at trial on this claim) that his removal stemmed from a purposeful scheme to suppress dissent within the union. Kazolias's evidence of a purposeful scheme to suppress dissent consists of his and his fellow plaintiffs' challenged job referrals and the comments made by Maraia and other union members concerning the cost and merits of this suit. This is substantially less than the "longstanding and well-documented patterns of harassment and intimidation" evidence provided by plaintiffs in this Circuit who have successfully met this evidentiary burden. See Maddalone, 152 F.3d at 184.

For instance, in Maddalone, this Circuit held that the plaintiff's LMRDA claim that his termination as shop steward, and discharge from a job, was in retaliation for his dissident speech, survived a motion to dismiss. See id. at 185. Maddalone presented sufficient facts to support his theory that the union president, Devine, had ordered the termination of every member who had participated in certain protest demonstrations against the union, including Maddalone, who was also serving as union vice president at the time. Maddalone offered the findings of an Investigations and Review Officer appointed to enforce a consent decree that union leaders had initiated the firings and engaged in other acts of intimidation towards dissidents, as well as the

affidavit of a former union president who affirmed that Devine's representatives and supporters attempted to suppress dissenting voices during union meetings.  See id.

In Johnson v. Kay, 860 F.2d 529 (2d Cir. 1988), this Circuit held that Johnson's LMRDA claim survived a motion to dismiss because she had alleged "organized attempts by the defendants to prevent union members sympathetic to Johnson from expressing their views." Id. at 537.  Johnson, then the president of her union, alleged that thirty-five of her rival's supporters invaded a meeting which she was chairing and engaged in other pre-planned disruptive tactics at her rival's direction.  See id.  Johnson also alleged that this rival faction seized the union building, prevented her from communicating with her supporters, and even physically threatened her.  See id.  However, Johnson's additional evidence which suggested that her rivals wished to retaliate against her as an individual was insufficient to support a LMRDA claim.  See id. at 536-37.

In Cotter v. Owens, 753 F.2d 223 (2d Cir. 1985), this Circuit found that Cotter had established a genuine issue with respect to whether a scheme to suppress dissent within the union existed by showing a fifteen-year history of litigation between his and opposing factions within the union.  See id. at 229.  A similar showing of years of litigation and conflict enabled the plaintiff to proceed with his LMRDA claim in Schonfeld v. Penza, 477 F.2d 899, 901 n. 2 (2d Cir. 1973).

Kazolias has not presented the requisite "clear and convincing" evidence to support his theory that he was removed as a benefits trustee because the union maintained a broader scheme to suppress dissent.  He has insufficient evidence that his removal was pursuant to "established union history or articulated policy." Schonfeld, 477 F.2d at 903.  Thus I conclude, and respectfully request that Your Honor should conclude, that Kazolias's LMRDA claim related to

his discharge from his position as benefits fund trustee be dismissed.

### D.  Swingle's Additional LMRDA Claim

In the Amended Complaint, Swingle alleged that his rights under the LMRDA were violated by Sam Fratto, and, by way of explanation, cites to a letter directed to Judge Robinson and to his objections to my Report and Recommendation on Lightmore's motion to dismiss. D.E. 39 at ¶ 129.  From my review of Plaintiffs' Objections to the Report and Recommendation, and the attached letter to Judge Robinson, it appears that Swingle was alleging that Fratto violated the LMRDA when Fratto told Swingle and his co-worker that he had received a complaint from their employer, Sausto Electric, that they were working "slower than snail shit." See D.E. 29.  As I found *supra*, Swingle has failed to produce evidence that this comment reflects the union's retaliatory intent.  In addition, presuming that Swingle intends to state a claim under Section 101(a)(2), he has not established that he suffered any damages as a result of this comment.  He was not terminated from the job with Sausto.   Thus I conclude, and respectfully recommend that Your Honor should conclude, that Swingle's Title I LMRDA claim with respect to his employment with Sausto Electric should be dismissed.

### E.  Roxby's Additional LMRDA Claim

Roxby alleges a Section 609 claim arising from his termination from Travis Electric in December 2010, raised for the first time in his opposition papers to the instant motion.  See D.E. 83 at 11.  I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be dismissed because it arose after the Amended Complaint was filed and was therefore not properly pled.

In the alternative, this claim should be dismissed because it appears to be meritless. Roxby alleges that the Labor-Management Committee's resolution of his grievance and the

union's demotion were acts of retaliatory discipline, in violation of Section 609 of the LMRDA, 29 U.S.C. § 529. Roxby argues that the Labor-Management Committee's decision was retaliatory because the three union representatives on the committee were appointed by Maraia, not Kazolias, and therefore were inherently biased against him. D.E. 81 ¶ 62. As evidence that he was in fact qualified for the job, he points to the decision of the New York State Unemployment Insurance Appeal Board permitting Roxby to receive unemployment benefits because "although the employer was well within its rights to discharge the claimant" for his "poor performance," "poor performance" is not a reason to disqualify someone for unemployment benefits. See D.E. 81 ¶ 65.

This evidence is insufficient to create a genuine issue of material fact relating to whether the union violated Section 609. Section 609 prohibits a union from disciplining a member for engaging in activities which are protected under Title I of the LMRDA. See 29 U.S.C. § 529. First, it is unclear whether the Labor-Management Committee's decision on Roxby's termination constitutes *union* discipline, as the committee is comprised of three union representatives and three representatives of employers who are parties to the CBA. Defendants argue that Roxby's demotion by the union also does not fall within the "otherwise discipline" prong of Section 609 because his demotion "was not the result of an established union disciplinary process, as is required under the statute." See Defts.' Reply, D.E. 87, at 16 (quoting Maddalone, 152 F.3d at 185).

Even if both instances constitute discipline for the purposes of Section 609, though, Roxby's claim fails because he has not provided evidence to challenge the union's non-retaliatory reason for requiring him to undergo remedial training–namely, that he was terminated for refusing to work as directed and for being unqualified, and he then refused to demonstrate that

38

he was qualified.  Even the evidence Roxby offers in support of his qualifications, the Unemployment Bureau's decision, reflects that his employer terminated him for "poor performance."  Thus I conclude, and respectfully request that Your Honor should conclude, that summary judgment be granted for Defendants on this claim, because Roxby raised it for the first time in his submissions on this motion, and because it is meritless.

    F.  Plaintiffs' LMRDA Claims against Maraia

    Although Plaintiffs have not provided direct evidence that Maraia manipulated the referral list so as to deny them access to jobs, they have provided evidence of his retaliatory intent towards them, and as business manager, he supervised the referral of applicants to jobs. Thus I conclude, and respectfully recommend that Your Honor should conclude, that the referral-related claims which survive summary judgment as against the union should also do so as against Maraia.

## IV.  Plaintiffs' Breach of Contract Claims under the LMRA

    A.  The LMRA

    Under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185, federal district courts have jurisdiction over "suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, . . . without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U.S.C. § 185(a).  An individual union member may bring suit under 301(a) for breach of a collective bargaining agreement or for a breach of an international union constitution, which the Supreme Court has construed as a contract between labor organizations.  See Wooddell v. International Broth. of Elec. Workers, 502 U.S. 93, 101 (1991).

As with LMRDA claims, courts possess discretion over whether to require plaintiffs to exhaust intra-union remedies prior to bringing suit under the LMRA.  "An employee seeking a remedy for an alleged breach of the collective-bargaining agreement between his [ or her ] union and employer must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement before he [ she ] may maintain a suit against his [ or her ] union or employer under § 301(a) of the Labor Management Relations Act. . ." Clayton, 451 U.S. at 681.  The Supreme Court has required exhaustion of grievance and arbitration procedures as provided in collective bargaining agreements because Congress indicated its preference for such agreed-upon contractual remedies over judicial intervention, and because exhaustion gives unions and employers an opportunity to resolve disputes. See Republic Steel Corp. v. Maddox, 379 U.S. 650, 653 (1965).

However, where a plaintiff's dispute with the union is based on a breach of the duty of fair representation, the plaintiff is not required to exhaust the union's *internal* dispute resolution procedures because "[t]his allegation raises issues rooted in statutory policies extending far beyond internal union interests." See Clayton, 451 U.S. at 688-89.  Instead, as previously noted, courts have discretion over whether to require exhaustion of internal union remedies, and are to use the three factors listed in Clayton as a guide. See id. at 689.

In this Circuit, it appears that individual union officers *may* be held liable for breaches of an internal union constitution, but only for equitable relief.  See Shea v. McCarthy, 953 F.2d 29, 32 (2d Cir. 1992)(concurring with other circuit courts which upheld individual liability under the LMRA only insofar as those cases provided equitable relief, not money damages); Madden v. International Ass'n of Heat and Frost Insulator and Asbestos Workers, 889 F.Supp. 707, 711-12 (S.D.N.Y. 1995)(applying Shea to conclude that union officers could only be held liable for

40

equitable relief for breaches of internal union constitution); 29 U.S.C. § 185(a) ("Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.").

The statute of limitations for a Section 301 claim by a union member against a local union, alleging that the local has breached its international constitution, is generally the state statute of limitations for breach of contract actions.  See Phelan v. Local 305 of United Ass'n of Journeymen, 973 F.2d 1050, 1061 (2d Cir. 1992).  Under New York State law, the statute of limitations for a breach of contract claim is six years.  N.Y. C.P.L.R. § 213(2).

### B.  Plaintiffs' Breach of Contract Claims

First, as a preliminary matter, I conclude that Plaintiffs were not required to exhaust their intra-union remedies.  Although the referral appeals procedure is established in the CBA, Plaintiffs' claims here are more akin to the internal union disputes considered by Clayton than the disputes between union member and employer considered in Republic Steel Corp..  Thus, the question of whether Plaintiffs' breach of contract claims against the union should be dismissed because they failed to utilize internal union dispute resolution procedures is within the Court's discretion.  Although Plaintiffs have not established that they would be unable to obtain a fair hearing on their claims, they request compensatory damages; neither the CBA, International Constitution, nor LU 363 by-laws make it clear whether the Appeals Committee would be authorized to provide Plaintiffs with monetary damages.  I conclude, and respectfully request that Your Honor should conclude, that exhaustion should not be required here.

In their Amended Complaint, Plaintiffs allege that the union breached the CBA by failing to refer them to work in accordance with the referral rules.  D.E. 39 ¶ 120.  They also allege

41

that Lightmore employed "shop employees," and had Lightmore agents filling the roles of

foreman and general foreman on that job instead of union members, in violation of the CBA.

See id. ¶ 32.[12]  In their Memorandum of Law in opposition to this motion, Plaintiffs also argue

that the union violated the IBEW Constitution by enacting referral procedures other than those

contained in the CBA, and that those additional written referral procedures, D.E. 76-4, conflict

with the CBA and the IBEW Constitution.  D.E. 81 at 32-33.

Defendants respond by stating that the written referral procedures were promulgated by

Maraia in accordance with the union's by-laws, which grant him the power to establish such

procedures.  D.E. 87 at 13.  Article XIV, Section 10 of these by-laws states in pertinent part that

"The handling of jobs for unemployed members shall be under the full supervision and direction

of the Business Manager's office.  He shall devise such means as he considers practical and fair

in distributing available jobs to such members, if they are qualified to do the work."  D.E. 76-7 at

24.  This by-law makes no mention of submitting such procedures to the International Union for

approval, although Article 15, Section 6, of the IBEW International Constitution states that "All

by-laws, amendments and rules . . . of any kind or nature, shall be submitted in duplicate form to

the I.P. for approval."  See D.E. 76-5 at 41-42.  However, because Maraia established the referral

procedures pursuant to the IBEW-approved by-law, I conclude that such procedures do not

constitute additional "by-laws, amendments and rules," so did not require additional approval

from the International Union.

---

[12]Although Plaintiffs reiterate the claim that Lightmore and other contractors employed "shop employees" in violation of the CBA in their submissions on this motion, they do not provide facts to establish 1) that contractors maintain shop employees; 2) how, if contractors do maintain shop employees, Plaintiffs have been injured by the practice; or 3) how the union should be held liable for the contractors' alleged CBA violations, as Plaintiffs have not filed any grievances which were not time-barred alleging that an employer maintained such employees.

In addition, Article 15, Section 10, of the IBEW Constitution also states that "all L.U.'s shall be compelled to live up to all approved agreements," such as the CBA. Thus, Plaintiffs argue that if the written referral procedures in some way conflict with or abrogate the referral procedures described in the CBA, the union would be in violation of the CBA for following its own written referral procedures, and this CBA violation would violate the IBEW Constitution.

I find no such conflict between the referral procedures established in the CBA and those in the union's written referral procedures, nor do Plaintiffs explain where such a conflict would arise. Section 4.11 of the CBA provides that applicants for work be referred in accordance with the date on which they signed the out-of-work list. See D.E. 76-2 at 23. One exception to this general rule, contained in Section 4.14(a), is when an employer states "bona fide requirements for special skills and abilities in his request for applicants." See id. at 24. Although the CBA does not list which special skills requirements are "bona fide," Plaintiffs have provided no evidence aside from the conclusory allegations in Swingle's affidavit that the list of specialties provided by the union is illegitimate. Section 2.02 of the CBA also enables an employer to choose his or her foreman. See D.E. 76-1 at 5.

The union's written referral procedures do not substantively alter the CBA referral rules; they are generally concerned with effectuating those rules by establishing the protocol for contacting applicants, how many time they are permitted to refuse to take a job prior to being stricken from the book, how long the referral agent should wait for a call back before moving to the next applicant, and so forth. The referral procedures confirm that an individual may be referred out of order if he or she possesses special skills. See D.E. 76-4 ¶ 16. In accordance with these procedures, the business manager may also appoint a shop steward on a job, regardless of the steward's prior position on the referral list. Id. Although this rule does not

explicitly appear in the CBA, it does not directly conflict with Section 2.14 of the CBA, which permits a local union to appoint a shop steward in certain situations.   See D.E. 76-1 at 8.  Thus, I conclude, and respectfully recommend that Your Honor should conclude, that the union's referral procedures, as written, do not constitute a breach of contract under either the CBA or the IBEW Constitution.

Although I find that the union did not commit a breach of contract by establishing additional written referral procedures, I do conclude that any failures by the union to comply with such procedures which resulted in the denial of job referrals to Plaintiffs constitute breaches of the CBA, and therefore of the IBEW Constitution.   Unlike Plaintiffs' DFR, ADEA, and LMRDA claims, these straightforward breach-of-contract claims do not require a showing that the union acted with retaliatory intent in committing a breach–only that it did so.  For the reasons previously discussed, I decline to require Plaintiffs to have exhausted intra-union remedies, because to the extent that they seek compensatory damages, the union has not established that it has the capacity to provide this kind of relief.  Thus, I conclude those challenged referrals for which a genuine issue of material fact remains as to whether the union complied with established referral procedures should survive summary judgment.  Those challenged referrals are as follows:

### 1. *Kazolias's Surviving Challenged Referrals*

Kazolias's challenged referrals which took place on November 18, 2009, and March 2, 2010, and which form the basis for Kazolias's surviving DFR claims, also form the basis for breach of contract claims.  Also surviving are those referrals discussed in the section of this Report and Recommendation, *infra*, devoted to Kazolias's ADEA retaliation claims, which occurred on October 21, 2008; October 28, 2008; November 12, 2008; November 13 - 24, 2008;

and December 1 - 3, 2008.  Although the latter referrals did not provide the basis for ADEA

retaliation claims, since Kazolias had not adduced sufficient evidence that the union acted with

retaliatory intent, genuine issues of material fact remain as to whether these referrals were made

in accordance with the union's established referral procedures.  I therefore conclude, and

respectfully recommend that Your Honor should conclude, that summary judgment on Kazolias's

breach of contract claims should survive with respect to these challenged referrals.  For all other

of Kazolias's challenged referrals, I conclude, and respectfully recommend that Your Honor

should conclude, that no genuine issue of material fact exists, and therefore summary judgment

should be granted on those claims.

### 2. *Swingle's Surviving Challenged Referrals*

On February 29, 2008, Swingle was passed over for a job referral because, the union

claims, he lacked the requisite arc flash certification.  See D.E. 76-30.  Swingle affirms that he in

fact has the requisite certification, see D.E. 82 at 28, and the Union's list of Swingle's

certifications also indicates that he possesses it, see D.E. 76-37.

On March 10, 2008, and March 11, 2008, Swingle was passed over for referral to two

jobs. According to the union, Swingle lacked the qualifications for those jobs: respectively, a

confined space specialty and an arc flash certification.  See D.E. 76-30.  However, as indicated

by Swingle in his affirmation, and by the union's list of Swingle's specialties, Swingle possessed

these qualifications.

On March 11, 2008, Swingle was passed over for referral because, according to the

union, it was a night job.  See D.E. 76-30.  In his affirmation, Swingle argues that passing him

over for a job because it was a night job is in violation of the CBA (and I infer from his objection

to the referral that Swingle would have taken the job if offered it).  See D.E. 82 ¶ 7.  Nowhere

does the Union explain why Swingle could not be referred to night work.  Night work is not

listed on the Union's list of specialties, <u>see</u> D.E. 76-8; it is not listed in the referral procedures as

a reason for referring an individual out of chronological order, <u>see</u> D.E. 76-4 ¶ 16; and it is not

mentioned in Article IV of the CBA, which governs referral procedures, <u>see</u> D.E. 76-1 at 21,

D.E. 76-2 at 22-25.

Swingle was repeatedly passed over for referral from March 20, 2008, to March 31,

2008.  The union asserts that Swingle was on vacation at this time; Swingle affirms he was not.

<u>See</u> D.E. 76-30; <u>see</u> D.E. 82 ¶ 9.

Finally, Swingle was repeatedly passed over on the referral list from August 20, 2008, to

August 26, 2008.  The union claims Swingle did not receive these referrals because at that time

he was working in Albany.  <u>See</u> D.E. 76-30.  However, Swingle affirms that on August 19, 2008,

he was laid off from his job in Albany, and also affirms that he told the union he was available

for referrals at that time.  <u>See</u> D.E. 82 ¶ 10.

Because genuine issues of material fact remain as to whether the union complied with the

referral procedures in the CBA in Swingle's foregoing challenged referrals, I conclude, and

respectfully recommend that Your Honor should conclude, that summary judgment be denied on

these claims.  For all other of Swingle's challenged referrals, I conclude, and respectfully

recommend that Your Honor should conclude, that no genuine issue of material fact exists, and

therefore summary judgment should be granted on those claims.

### 3. *Roxby's Surviving Challenged Referrals*

On Feburary 29, 2008, and March 11, 2008, Roxby was passed over for job referrals in

favor of other applicants, Stroud and Calegari, respectively.  <u>See</u> D.E. 76-26.  According to the

union, this occurred because an arc flash specialty was required for the referral, a specialty

Roxby lacked but these applicants possessed.  Id.  However, according to the list produced by the union of Roxby's specialties, he possesses this qualification.  See D.E. 76-36.

On March 11, 2008, Roxby was passed over for referral in favor of another applicant, Lopez, because, according to the union, it was a night job.  See D.E. 76-26.  However, as previously noted, the union has not explained why the time of day of a job should affect the referral.

On August 4, 2008, Roxby was passed over for a referral in favor of applicants Hall, Heppner, Plummer, Bremer, and Gilmore, and on August 5, 2008, in favor of Bisbing.  The union claims this occurred because Roxby was working at another job at the time.  See D.E. 76-26.  Roxby noted, however, that he was not sent to that job, for Sass Electric, until August 7, 2008.  See D.E. 76-11.  Indeed, the work order the union provided for Roxby's referral to Sass states that Sass requested a journeyman on August 6, 2008, *after* these referrals were made.  See D.E. 76-27 at 12 - 21.

On August 14, 2008, Roxby was passed over for referral in favor of another applicant, Baisley, because, according to the union, Roxby was still working at Sass.  See D.E. 76-26. However, the union's documentation indicates that Roxby was terminated from the job with Sass on August 13, 2008.  See D.E. 76-28 at 1 - 5, D.E. 76-40.

I therefore conclude, and respectfully recommend that Your Honor should conclude, that summary judgment on Roxby's breach of contract claims should survive with respect to these challenged referrals.  For all other of his challenged referrals, I conclude, and respectfully recommend that Your Honor should conclude, that no genuine issue of material fact exists, and therefore summary judgment should be granted on those claims.

C.  Plaintiffs' LMRA Claims against Maraia

In their Amended Complaint, Plaintiffs indicated they sought both equitable relief and money damages.  See D.E. 39 ¶ 139(a) and (b).  They did not specify on which claims they sought equitable relief.  Plaintiffs may hold a union officer individually liable for violations of the LMRA, but only for equitable relief.  See Shea, 953 F.2d at 32.  However, Maraia affirms, and Plaintiffs do not dispute, that he is the "former" Business Manager.  See D.E. 86 ¶ 1.  The parties do not establish whether Maraia continues to serve as a union official in a capacity which would enable him to provide any such equitable relief.  Thus I conclude, and respectfully recommend that Your Honor should conclude, that summary judgment is inappropriate on these claims as against Maraia.

## V.  Plaintiffs' Age Discrimination and Retaliation Claims under the ADEA

### A.  Plaintiffs' ADEA Age Discrimination Claim

In their opposition papers, Plaintiffs clarify that they contend that Lightmore discriminated against them because of their age when it fired them, and the union discriminated against them because it did not pursue Plaintiffs' grievances against Lightmore as aggressively as they would have liked.  D.E. 83 at 36.  Plaintiffs have not argued, however, that the union's alleged failures to refer them to work were the result of age-based discrimination.  In order for Plaintiffs to demonstrate that the union violated the ADEA in its resolution of their Lightmore-related grievances, they would have to show "at a minimum, that the union breached its duty of fair representation and that its actions were motivated by discriminatory animus."  McIntyre v. Longwood Central School District et al., 380 Fed. Appx. 44, 49 (2d Cir. 2010).  Plaintiffs have simply provided no evidence that the union held the requisite age-based "discriminatory animus" against them.  Thus I respectfully recommend that Plaintiffs' claim that the union discriminated against them on the basis of their age be dismissed.

B.  Plaintiffs' ADEA Retaliation Claims

Plaintiffs claim that because they have engaged in activities protected by the ADEA, the Union has retaliated against them by failing to refer them to work, among other retaliatory acts previously discussed.  See D.E. 83 at 37 - 39.  The ADEA prohibits labor organizations from discriminating against a member because that member "opposed any practice made unlawful by this section, or because such individual, member or applicant for membership has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."  29 U.S.C. § 623(d).  In order to make out a prima facie claim that a union engaged in retaliation in violation of the ADEA, a plaintiff must demonstrate that: 1) he or she engaged in a protected activity under the ADEA; 2) the union knew of the protected activity; 3) the union took an adverse employment action against the plaintiff; and 4) "a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."  Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199, 205-06 (2d Cir. 2006).

Once the plaintiff has made out this prima facie case for ADEA retaliation, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action.  See Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106, 110 (2d Cir. 2010).  If the defendant can do so, the burden shifts back to the plaintiff to show that the defendant's proffered reason was a pretext for a retaliatory motive.  Id.

In addition, courts in this Circuit have repeatedly recognized that in order for a union member to make out a claim against his or her labor union under Title VII or the ADEA, the plaintiff must show that the union violated its duty of fair representation.  See McIntyre v. Longwood Cent. School Dist., 380 Fed.Appx. 44, 50 (2d Cir. 2010)(in order to pursue a Title VII

or ADEA claim against his labor union, a plaintiff "would have to show, at a minimum, that the union breached its duty of fair representation and that its actions were motivated by discriminatory animus"); Nweke v. Prudential Ins. Co. of America, 25 F.Supp.2d 203, 220 (S.D.N.Y. 1998); Agosto v. Correctional Officers Benev. Ass'n, 107 F.Supp.2d 294, 304 (S.D.N.Y. 2000)(noting that "courts in this Circuit generally incorporate the duty of fair representation as one of the elements of the alleged Title VII violation," and collecting cases in support).

Finally, a claim under the ADEA carries procedural as well as substantive requirements. In order to bring a federal action for violation of the ADEA, a plaintiff must first file an administrative complaint with the EEOC within 300 days of the alleged discriminatory action. See Brodsky v. City University of New York, 56 F.3d 8, 10 (2d Cir. 1995). ADEA claims later alleged in litigation must be "within the scope of the EEOC investigation reasonably expected to grow out of" the filing of the administrative complaint. Miller v. International Telephone and Telegraph Corp., 755 F.2d 20, 23-24 (2d Cir. 1985).

### 1. Kazolias's ADEA Retaliation Claims

#### a. Exhaustion of Administrative Remedies

On September 15, 2008, Kazolias filed his first ADEA complaint with the EEOC against both Lightmore and the union. See D.E. 75-32. In this complaint, Kazolias alleged that Lightmore violated the ADEA because he was treated differently at the Blue Hill job site due to his age, and was terminated because of his age and because he had complained to his union of Lightmore's discriminatory treatment. Id. Kazolias complained that the union failed to respond quickly to Plaintiffs' complaints about the Blue Hill job while they were still employed by Lightmore, and that the union had only agreed to represent them on five of ten grievances

against Lightmore.  Id.

On May 19, 2009, Kazolias filed his second ADEA complaint with the EEOC against the union.  See D.E. 75-35.  He alleged that the union continued to retaliate against him, and described the February 2009 union meeting at which Maraia made derogatory comments about those individuals who were pursuing charges of discrimination against the union.  See id.

Kazolias, like Swingle, now alleges that the union has retaliated against him for filing EEOC complaints and for commencing this suit.  This retaliation has taken several forms: the challenged job referrals; Maraia's "constant harassment" of Kazolias in his role as president, see D.E. 39 ¶ 127; and other discrete instances of allegedly unfair treatment related to various jobs Kazolias held in 2008 and 2009, see id., which were raised in Plaintiffs' *pro se* Amended Complaint but not referenced in Plaintiffs' Memorandum of Law opposing summary judgment, see D.E. 83.  Of those alleged retaliatory acts, only those challenged referrals occurring prior to May 19, 2009, were referenced in an EEOC complaint.

Under Carter v. New Venture Gear, Inc., the exhaustion requirement is excused for all those allegedly retaliatory acts which occurred after the filing of Kazolias's first EEOC complaint in September 2008 because those acts are "reasonably related" to his timely complaints under either the second or third categories described in that decision.   310 Fed.Appx. 454, 458 (2d Cir. 2009).  However, instances of retaliation which occurred after the Amended Complaint was filed will not be considered for the reasons previously stated.

b. *Kazolias's Prima Facie Case for Job Referral-Related ADEA Retaliation Claims*

The next question is whether Kazolias has made out his prima facie case with respect to the alleged retaliatory acts.  As part of this case, Kazolias must show that the asserted adverse

actions constitute breaches of the union's duty of fair representation. See McIntyre, 380

Fed.Appx. at 50. The filing of the September 15, 2008, EEOC complaint was ADEA-protected

activity, so Plaintiff has satisfied the first prong of his prima facie case. Although no party's

statement of facts includes the date upon which Defendants became aware of these EEOC

charges against them, Defendants do not argue they were unaware of the charges, and the EEOC

has a statutory duty to "promptly" initiate its informal resolution process upon receipt of a

charge. 29 U.S.C. § 626(d)(2). This receipt appears to have occurred on September 16, 2008.

See D.E. 39-1 at 6. Thus I presume for the purposes of this motion that the union was informed

of the charges shortly after the EEOC received it. However, Kazolias claims to have been

improperly passed over five times on September 17, 2008. See D.E. 76-13 at 1. Plaintiff has

failed to provide any proof that the union was aware of its EEOC complaint the day after the

EEOC received it, and I decline to assume otherwise. Thus I conclude, and respectfully

recommend that Your Honor should conclude, that ADEA retaliation claims relating to those

five referrals be dismissed, as Plaintiff has failed to establish the union's knowledge of those

charges at that time.

Having satisfied the first two prongs of his prima facie case with respect to the remaining

referrals, Kazolias must next assert that he suffered an adverse action. In order for the union to

have engaged in an adverse action against Kazolias, that action must also constitute a breach of

its duty of fair representation. The union contends that Plaintiffs' challenged job referrals cannot

constitute adverse actions because all of the challenged referrals were made in accordance with

union procedure, and so were not breaches of the duty of fair representation.

As I have previously concluded that genuine issues of material fact remained on two of

the job referrals which Kazolias contends constitute duty of fair representation breaches, the

referral of Kelly on November 18, 2009, and of Buckman on March 2, 2010, I conclude that those breaches form the basis for ADEA retaliation claims as well. Kazolias has shown evidence of retaliatory animus, in the form of negative comments by Maraia and other union officers. Kazolias testified in his deposition in 2011 that "at regular union meetings this case is brought up repeatedly in that it cost them money, the local, $56,000, and this is a frivolous lawsuit." D.E. 75-7 at 52: 1-7. Kazolias testified that legal expenses for other lawsuits in which the union was a party were not mentioned at those meetings. Id. at 55: 19-24. He stated that negative comments about the cost of the suit and its merit were made by members of the union's executive board committee, as well as by Maraia, but indicates that these comments began after Kazolias became president of the union in July 2009. Id. at 123-25, 405. Thus, as to those two referrals, Kazolias has made out a prima facie case of an ADEA violation with respect to those two claims. A genuine issue of material fact remains with respect to the union's legitimate non-retaliatory reason for denying Kazolias the November 18, 2009 referral, and the union failed to provide any such a reason for the March 2, 2010 referral, so the union has failed to meet its burden with respect to these two claims. Thus I conclude, and respectfully recommend that Your Honor should conclude, that summary judgment on the ADEA retaliation claims based on these two challenged referrals should be denied.

In addition to the twenty-seven challenged referrals which fell between February 17, 2009, and the date the Amended Complaint was filed in August 2010, Kazolias challenges over forty referrals between the date his EEOC complaint was filed, September 15, 2008, and February 17, 2009. See D.E. 76-13 at 2 - 3. The union asserts that all challenged referrals were made in accordance with established referral procedures. However, the evidence provided by the union as to some of these referrals is contradictory. On October 21, 2008, Kazolias was not

referred to a job because it required arc flash and confined space specialties, which, according to the union, Kazolias lacked. The work order provided by the union supports the union's contention that the job required these specialties, but Kazolias appears to possess them, based on the list of his specialties provided by the union. See D.E. 76-13; D.E. 76-35. Thus it appears that the union's evidence does not support this otherwise legitimate reason for declining to refer Kazolias to this job.

On October 28, 2008, the union again asserts that Kazolias was not referred to a job because he was not qualified, but Kazolias appears to have the requisite qualifications, based on the union's supporting evidence. See D.E. 76-13; D.E. 76-35. The same problem with the Union's reason for not referring Kazolias occurs twice on November 12, 2008, twice on December 1, 2008, and once on December 2.

On November 13 - 24, 2008, Kazolias was repeatedly overlooked for referrals because, according to the union, Kazolias was working out of town during this period for L.U. 246. D.E. 76-16 at 6 - 10. However, Kazolias indicated on his prepared list of challenges that he has never worked for L.U. 246. See D.E. 80-52 at 5.

Kazolias claims that on December 3, 2008, he was improperly denied a job referral, which was given to another applicant, Sherwood. See id. at 2. The union appears to assert that this jump did not occur, but the date Olivieri lists for this challenged referral, December 2, 2008, is different than that asserted by Kazolias, and the Bates stamp numbers for those portions of the referral list that the union and Kazolias cite are also different. See D.E. 76-13. It appears, therefore, that the union's response to this challenged referral does not fully rebut Kazolias's claim. And, indeed, in that portion of the referral list which includes referrals made on December 3, 2008, which the union has provided in D.E. 76-17 at 20 - 21, it *does* appear that

54

Sherwood was referred to a job on December 3, 2008, ahead of Kazolias. Thus the union has provided no evidence to explain this out-of-order referral.

However, in order for these unexplained referrals to constitute breaches of the union's duty of fair representation, Kazolias must show some evidence that they were motivated by retaliatory intent. Kazolias's direct evidence of the union's animosity towards plaintiffs begins in February 2009 with Maraia's comments at the February 24, 2009, union meeting. Even if those comments could be taken as an indication of the union's desire to retaliate against Plaintiffs because of their EEOC complaints (Maraia stated he was "tired of the 3 or 4 members trying to bring down this Local with their petty claims of workmanship," see D.E. 80-29 at 2, not because they filed EEOC complaints), they provide insufficient evidence of the union's intent behind the unexplained referrals months earlier. Thus Kazolias has failed to demonstrate that these challenged referrals were motivated by retaliatory intent, so he has failed to demonstrate that they occurred as a result of the union's breach of its duty of fair representation. These referrals, then, do not qualify as adverse actions, and Kazolias has failed to make out his prima facie case of ADEA retaliation with respect to these claims. I therefore conclude, and respectfully recommend that Your Honor should conclude, that the ADEA retaliation claims related to those challenged referrals which occurred prior to February 17, 2009, should be dismissed.

### c. *Kazolias's Other ADEA Retaliation Claims*

In his Amended Complaint, Kazolias makes the following additional allegations of retaliation by the union: 1) the union caused his termination from an April 2008 job with Modern Electric; 2) a grievance he filed on September 19, 2008, against Olivieri was never acted upon; 3) the union sided with his employer, Perreca Electric, in October 2008 over a medical leave issue; 4) although he was the sole electrician on a job in February 2009 while the foreman was

out, he did not receive a foreman's higher wage; and 5) Kazolias suffered "constant harassment" by Maraia during Kazolias's tenure as president of the union.  See D.E. 39 ¶ 127.

First, Kazolias's April 2008 claim predates the filing of his EEOC complaint.  Plaintiff, in his memorandum of law, clearly indicates that he is alleging retaliation by the union for filing the EEOC complaints and this suit.  Thus I conclude that any ADEA retaliation claim arising from this incident should be dismissed.

Second, Kazolias alleges that the union ignored his grievance against Olivieri for retaliatory reasons.  Kazolias does not argue this point in his Memorandum of Law, but he asserts it in his somewhat unconventional Rule 56.1 Counter-Statement.  See D.E. 83 ¶ 77.  Although Defendants do not specifically move for summary judgment on this claim, they do move for summary judgment of the complaint in its entirety, and Defendants' oversight of a one-sentence claim in a 145-page *pro se* amended complaint and an argument made in what under the local civil rules should be a counter-statement of *facts*, is excusable.

Kazolias has alleged a protected action, the filing of his EEOC complaint on September 15, 2008.  I presume the union knew of this action on September 19, 2008, when the grievance was allegedly filed.  However, Plaintiff has failed to demonstrate that the local union committed an adverse action against him.  Kazolias testified that he filed a grievance against Olivieri because, in addition to referring members to jobs, he assigned them to particular shifts on a given job as well.  See D.E. 83 ¶ 77.  Kazolias testified that he believed Olivieri "had no right" to assign members to particular shifts.  Id.  He filed a grievance against Olivieri with the union, but then testified that the local union informed him via letter that it was a matter for the international union, and that the international union then corresponded to state that it did not wish to become involved.  The letters are not part of the record before the Court, and regardless, the international

union's statement is inadmissible hearsay, since the international union is not a named defendant. Kazolias also testified that upon receiving this correspondence, he could not recall pursuing the matter further. See D.E. 80-5 at 147: 21. Thus Plaintiff has not demonstrated that the union took an adverse action against him; it responded to his grievance against a local union officer by referring the matter to the international union. I thus conclude that Kazolias fails to make out a prima facie case of ADEA retaliation on this claim.

Third, Kazolias alleges that he was retaliated against by the union when the union sided with his employer at the time, Perreca Electric, over a medical leave issue in October 2008. Kazolias's foreman wanted him to cancel medical appointments he had scheduled for working hours. D.E. 80-5 at 149: 14-17. When Kazolias was initially referred to the Perreca job, he was assigned to the night shift, and he scheduled a series of oral surgery appointments, part of the same procedure, for daytime hours, and had been advised by his night shift foreman that missing work for a medical appointment was permitted. D.E. 80-5 at 150. Kazolias was abruptly switched to the day shift, which conflicted with the appointments he had previously scheduled, and his new day shift foreman informed him he would not be permitted to take time off to continue the appointments. Id. at 151-152. Kazolias testified that Gilbert Heim, his business representative, told him he would have to reschedule those medical appointments or he would support the contractor if Kazolias was terminated because of missed work. Id. at 156: 2-8. Heim testified that he in fact did *not* support the employer's position because it was a sudden change from the employer's earlier policy, see D.E. 75-24 at 13-15, and that he argued for Kazolias to be able to attend his previously scheduled appointments. Kazolias kept his appointment for the day after this dispute and canceled the remainder, and kept the job. D.E. 80-5 at 156.

Kazolias engaged in protected activity when he filed his EEOC complaint against the union on September 15, 2008.  As before, I presume that the EEOC promptly informed the union of this charge following receipt of Kazolias's claim, satisfying the second element of Kazolias's prima facie case.

Kazolias has failed to meet his burden in establishing that he suffered an adverse action here because he has failed to establish that the union's conduct in attempting to resolve this dispute breached its duty of fair representation.  According to Kazolias, Heim informed him that he had to cancel all appointments, aside from the appointment he had scheduled for the following day, as per his contractor's instructions.  If he did not and was fired, Heim would not pursue any grievance he might file against Perreca.  Kazolias implies that if he could not miss work to attend these appointments, he could not go at all.  Kazolias has not established, however, that Heim's comment constituted an act of sufficient severity to qualify as a DFR breach, or that it was motivated by retaliatory animus based on Kazolias's EEOC complaint filed a month earlier.  Thus, because Kazolias has failed to establish that he suffered an adverse action, he has failed to make out a prima facie case of retaliation with respect to this claim, and I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be dismissed.

Fourth, Kazolias alleges that he was denied a foreman's wage in his Amended Complaint. Defendants do not move for summary judgment on this claim specifically, but they do move for summary judgment of the Amended Complaint in its entirety.  As Plaintiff also does not discuss this claim in his submissions, and neither party cites any facts related to this claim,  I deem this claim abandoned, and recommend its dismissal.

Fifth, Kazolias also alleges that Maraia retaliated against him after he became president

of the Union in a number of ways.[13]  First, Maraia prevented him from appointing committee

members, see D.E. 75-11 at 399; second, Maraia permitted office staff to use a signature stamp

to sign checks, id. at 444; third, Maraia removed Kazolias as a trustee of the union's benefit

funds, id. at 438; fourth, Maraia asked Kazolias to resign as President, id. at 428; fifth, Maraia

permitted office staff to open Kazolias's official mail, id. at 436; sixth, Maraia threatened to

bring charges against Kazolias if he conducted union business without Maraia, id. at 423; and

seven, Kazolias claims that Maraia retaliated against Kazolias by ensuring that Kazolias lost his

reelection bid as chairman of the union's Executive Board, see id. at 400: 1-14.

As I previously concluded that none of these actions constitutes a breach of the union's

duty of fair representation, they cannot constitute adverse actions.  Thus Kazolias has failed to

make out a prima facie case of an ADEA retaliation claim with respect to any of these actions,

and I conclude, and respectfully request that Your Honor should conclude, that these claims

should be dismissed.

### 2. *Swingle's ADEA Retaliation Claims*

Defendants argue that Swingle's ADEA claim against the union, contained in his May 1,

2009, EEOC complaint, should be dismissed as untimely, since I previously recommended that

Swingle's ADEA claim against Lightmore be dismissed as untimely in my Report and

Recommendation on the motion to dismiss, and Swingle filed EEOC charges against both

Lightmore and the Union on the same day.  See D.E. 77 at 10 n. 1 (citing D.E. 28).  Plaintiff

---

[13]In fact, these allegations were not specifically mentioned in the Amended Complaint; they first arose through Defendants' moving papers here based on Kazolias's 2011 deposition. As Defendants clearly had an opportunity to respond to these claims, and they accrued prior to the filing of the Amended Complaint, I will consider them even though not formally pled prior to summary judgment.

does not respond to this argument directly.  See D.E. 83 at 37 - 39.  Instead, Plaintiffs allege that

they are seeking redress for retaliation which occurred as a *result* of the filing of their EEOC

claims and this suit.  Thus it appears that Swingle has abandoned the charges in his May 2009

EEOC complaint, which challenged the union's handling of Swingle's grievances against

Lightmore.

### a. *Exhaustion of Administrative Remedies*

Swingle alleges that he was retaliated against in violation of the ADEA for filing his two

ADEA complaints with the EEOC in May and July 2009 and for commencing this suit in August

2009.  See D.E. 83 at 1, 34.  In his timely July 8, 2009, EEOC complaint against the union,

Swingle alleges that the union retaliated against him by denying him job referrals and implies

that these denials occurred at least in part because of his prior EEOC complaint.  See D.E. 75-36.

Although Swingle never filed a complaint with the EEOC alleging that he suffered retaliation for

filing either his second EEOC complaint or this lawsuit, exhaustion of these claims is excused

because they are "reasonably related" to the timely claims.  See Butts v. City of New York Dept.

of Housing Preservation and Development, 990 F.2d 1397, 140203 (2d Cir. 1993) (excusing

exhaustion requirement in Title VII context where claims which arose after EEOC complaint

were 1) within the scope of the EEOC's investigation, 2) for retaliation following an EEOC

complaint, or 3) for additional instances of discrimination identical to those alleged in the EEOC

complaint); see Terry v. Ashcroft, 336 F.3d 128, 151 (2d Cir. 2003)(applying Butts to ADEA

claims because the administrative exhaustion requirements are the same under Title VII and the

ADEA).  Here, the administrative exhaustion requirement is excused for claims arising out of

challenged job referrals which occurred after the filing of Swingle's July 2009 EEOC complaint

because they are reasonably related to the charges in the July 2009 complaint under either the

second or third categories in <u>Butts</u>.

I decline to consider challenged referrals which occurred after the filing of the Amended
Complaint in August 2010, however, because those challenged referrals represent new ADEA
claims not pled in the complaint. Thus the relevant time period for Swingle's ADEA retaliation
claims is from the date the union became aware he filed his May 2009 EEOC complaint to the
date the Amended Complaint was filed on August 25, 2010.

### b. *Swingle's Prima Facie Case of ADEA Retaliation*

Swingle has not provided any evidence that he suffered an adverse employment action
during this time period. Swingle only challenges referrals occurring in 2008 and 2011. <u>See</u> D.E.
80-53. The 2008 challenged referrals could not have occurred as a result of retaliation for the
filing of Swingle's EEOC complaint in May 2009, and the 2011 referrals are ADEA claims first
raised before this Court in Plaintiff's opposition papers to the instant motion. Therefore I
conclude, and respectfully recommend that Your Honor should conclude, that Swingle's ADEA
retaliation claims should be dismissed.

### 3. *Roxby's ADEA Retaliation Claims*

Roxby alleges that he was denied job referrals in retaliation for filing his EEOC claims
and this suit. In the Amended Complaint, he also alleged that the union did not adequately
respond to his complaints about his termination from Filingeri Electric because of a retaliatory
motive. <u>See</u> D.E. 39 ¶ 128. However, Roxby's termination from Filingeri occurred on August
25, 2008, and neither party has included, in their Rule 56.1 statements, facts to suggest that the
union's decision not to pursue Roxby's complaints against Filingeri was made after it learned of
Roxby's EEOC complaint against the union, which was filed on September 15, 2008. Thus I
conclude that Roxby's retaliation claim relating to his termination from Filingeri fails as a matter

of law.

Roxby alleges that he was passed over for job referrals for retaliatory reasons fifteen times between the date his EEOC complaint was filed and the date the complaint was filed. See D.E. 76-25 at 1 - 2.  The earliest challenged referral occurred on October 13, 2008, and the latest on June 1, 2009.  See id.  Roxby engaged in protected activity when he filed his first EEOC complaint on September 15, 2008; when he filed his second EEOC complaint on May 6, 2009; and when he commenced this suit on August 17, 2009.  In order for Roxby to make out a prima facie case of retaliation in violation of the ADEA, he must first show that these challenged job referrals constitute breaches of the union's duty of fair representation.  As noted *supra*, Roxby can make out no DFR breaches between February 17, 2009, and the date of the filing of the Amended Complaint.  Roxby can also not make out a breach of the duty of fair representation with respect to challenged referrals prior to February 17, 2009, because he has provided no evidence that the union possessed retaliatory animus which motivated those challenged referrals.  The first direct evidence Plaintiffs provide of the union's retaliatory intent, Maraia's February 24, 2009, comments, post-dates those challenged job referrals.  Thus I conclude, and respectfully recommend that Your Honor should conclude, that Roxby's ADEA retaliation claims should be dismissed.

C.  Plaintiffs' ADEA Retaliation Claims against Maraia

To the extent that Plaintiffs allege that Maraia retaliated against them in violation of the ADEA, I conclude, and respectfully recommend that Your Honor should conclude, that all ADEA claims against Maraia should be dismissed, because this Circuit has held that the ADEA does not provide for individual liability.  See Lore v. City of Syracuse, 670 F.3d 127, 169 (2d Cir. 2012) (no individual liability in Title VII cases); see also Martin v. Chemical Bank, 129

F.3d 114, at *3 (2d Cir. 1997)(no individual liability under the ADEA).

## VI. Plaintiff's State Law Age Discrimination Claims

In their Amended Complaint, Plaintiffs assert a claim for age discrimination under New York State Human Rights Law Sections 290 - 297. See D.E. 39 ¶ 11. Defendants argue that such claims are preempted by federal labor law. D.E. 77 at 32 - 34. Plaintiffs do not respond to this argument in their opposition papers; instead they simply argue for Defendants' liability under state and federal law. D.E. 83 at 36 - 39.

The Supreme Court has held that "an application of state law is preempted by § 301 of the Labor Management Relations Act of 1947 only if such application requires the interpretation of a collective-bargaining agreement." Lingle v. Norge Div. Of Magic Chef, Inc., 486 U.S. 399, 413 (1988). Plaintiffs' referral-related age discrimination claims require interpretation of the collective bargaining agreement. These claims rest on Plaintiffs' interpretation of the CBA as prohibiting the challenged referrals. Defendants' proffered legitimate, non-retaliatory reasons rest on *their* interpretation of the CBA as permitting the challenged referrals. Thus a determination of whether the claims relating to the challenged referrals should survive summary judgment requires this Court to evaluate the parties' competing interpretations of the CBA and consider whether a genuine issue of material fact remains as to the agreement's meaning. See Compagnie Financiere de CIC et de l'Union Europeenne v. Merrill Lynch, 232 F.3d 153, 157 - 58 (2d Cir. 2000) (describing when summary judgment is appropriate in contract dispute context). I therefore conclude, and respectfully recommend that Your Honor should conclude, that Plaintiffs' state law age discrimination claims should be dismissed because they are preempted.

## VII.  Plaintiffs' Title VII Claims

In their Amended Complaint, Plaintiffs allege that some or all of the defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e - et seq.[14]  See D.E. 39  ¶ 1.  They also indicate that they wish to pursue a hostile work environment claim against LU 363 and John Maraia, although they do not specify whether this claim would arise under Title VII, the ADEA, or as some kind of continuous DFR violation.  See id. ¶ 130.  As I previously recommended in my Report and Recommendation on the Lightmore Defendants' Motion to Dismiss the original complaint, Plaintiffs have not asserted any facts which would entitle them to relief under Title VII.  See D.E. 28 at 7, 12 n. 1.  Title VII prohibits employment discrimination on the basis of "race, color, religion, sex, or national origin."  42 U.S.C. §2000e-2 (a), (c).  Plaintiffs have not alleged, either in their original or amended complaint, that they were discriminated against because of their "race, color, religion, sex, or national origin."  Thus I reiterate my previous recommendation that these claims should be dismissed.

## VIII.  Plaintiffs' Equal Pay Act Claims

In their Amended Complaint, Plaintiffs claim that some or all of the defendants violated the Equal Pay Act of 1963, 29 U.S.C. § 206(d).  D.E. 39 ¶ 1.  This Act prohibits wage discrimination on the basis of gender.  29 U.S.C. § 206(d)(1).  It also prohibits labor organizations from causing or attempting to cause an employer to engage in such wage discrimination.  29 U.S.C. § 206(d)(2).  However, Plaintiffs do not allege any facts in support of this allegation.  Thus I conclude, and respectfully recommend that Your Honor should conclude,

---

[14]Plaintiffs also allege a violation of the Civil Rights Act of 1991, §§102, 103, in their Amended Complaint.  D.E. 39 ¶ 1.  This Act amended Title VII and the ADA; it does not provide Plaintiffs with a separate cause of action.  Thus I construe their claim under this Act as a reiteration of their Title VII and ADA claims.

that to the extent this claim was brought against the Union defendants, it should be dismissed.

## IX.  Plaintiffs' ADA Claims

In their Amended Complaint, Plaintiffs allege that some or all of the original defendants violated Title I of the Americans with Disabilities Act (the "ADA"). See D.E. 39 ¶ 1.  Title I of the ADA prohibits employment discrimination on the basis of an individual's disability.  42 U.S.C. § 12101 et seq.  It also prohibits retaliation against any individual who has "opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).  As I previously recommended in my Report and Recommendation on the Lightmore Defendants' motion to dismiss, I respectfully recommend that this claim be dismissed because Plaintiffs have failed to allege facts which would entitle them to relief under the ADA.  See D.E. 28 at 7, 12 n. 1.  That is, Plaintiffs have not alleged that they have disabilities, that they were discriminated against on the basis of any disability, or that they engaged in actions protected under the ADA which caused the union to retaliate against them.  Thus I conclude, and respectfully recommend that Your Honor should conclude, that to the extent Plaintiffs' Amended Complaint states an ADA claim against Maraia and the union, that claim should be dismissed.

## X.  Plaintiffs' OSHA Claims

In their Amended Complaint, Plaintiffs claim that some or all of the defendants violated the Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 et seq.  D.E. 39 at ¶¶ 13, 26.  OSHA does not create a private right of action.  See Donovan v. Occupational Health and Safety Review Comm'n, 713 F.2d 918, 926 (2d cir. 1983)("Under OSHA, employees do not have a private right of action").  Thus this Court lacks jurisdiction to entertain this claim.  See

Rompalli v. Portnova, No. 09 Civ. 3083(RMB)(FM), 2010 WL 2034362, at *2 (S.D.N.Y. May

21, 2010). I therefore conclude, and respectfully recommend that Your Honor should conclude,

that this claim should be dismissed.

## XI.  Plaintiffs' Claims under New York State Whistleblower Law

In their Amended Complaint, Plaintiffs allege that some or all of the defendants violated

New York State's "Whistleblowers' Statute," New York Labor Law § 740.[15]  This statute

prohibits an employer from engaging in a "retaliatory personnel action" against an employee

who discloses or threatens to disclose to a supervisor or to a public body that the employer is

pursuing a practice which violates the law and which "creates and presents a substantial and

specific danger to the public health or safety. . ." N.Y.L.L. § 740(2)(a).  An "employer" is

defined as "any person, firm, partnership, institution, corporation, or association that employs

one or more employees." Id. at § 740(1)(b).

Defendants move for summary judgment on this claim, arguing that it is preempted and,

in the alternative, time-barred. See D.E. 77 at 26-27, 27 n. 2.  Plaintiffs have failed to respond to

these arguments in their Memorandum of Law in opposition to this motion, or to mention this

claim. I therefore conclude that Plaintiffs have abandoned this claim, and it should be dismissed

on that ground.

In addition, I view the most natural reading of this claim, raised while Plaintiffs were still

proceeding pro se, as being raised against Lightmore, their former employer, for allegedly

terminating them for raising the safety-related electrical and building code violations mentioned

---

[15]Plaintiffs also allege a violation of New York Labor Law § 741, see D.E. 39 ¶ 14, but
that law specifically prohibits retaliation by health care services employers against employees.
See N.Y.L.L. § 741(1)(b).  As neither Lightmore nor the union was such an employer, I conclude
that this claim should be dismissed.

elsewhere in their Amended Complaint.  With this interpretation, this claim would already have
been dismissed when the parties stipulated to Lightmore's dismissal from this action.  To the
extent that Plaintiffs sought to assert this claim against the union, this claim would fail on
several grounds: under the statute, "employer" refers only to private employers, not labor unions,
and Plaintiffs did not assert that the *union* has engaged in a practice which endangers public
safety.  Thus I conclude, and respectfully request that Your Honor should conclude, that to the
extent this claim has not already been dismissed, summary judgment should be granted on this
claim.

## XII.  Plaintiffs' Allegations of National Electrical Code and Building Code Violations

In their Amended Complaint, Plaintiffs indicate that they are bringing this action
pursuant to the National Electrical Code and the "Fire and Building Codes" of the Hamlet of
Pearl River, New York.  See D.E. 39 ¶ 15.  Based on the recitation of facts in Plaintiffs'
Amended Complaint, I construe this statement as merely reiterating the safety violations
contained in Plaintiffs' grievances against Lightmore, not as an independent claim.  To the extent
that Plaintiffs intended to assert an independent claim against the Lightmore defendants for
allegedly violating these codes at the Blue Hill job site, the parties have already stipulated to a
dismissal of all claims against Lightmore.  See D.E. 64.

## XIII.  Plaintiffs' Claims of Breach of the Implied Duty of Good Faith and Fair Dealing

In their Amended Complaint, Plaintiffs alleged that the union violated this implied
contractual duty.  See D.E. 39 at 1, ¶ 130.  Defendants argue that this state law contract claim is
preempted by § 301 of the LMRA.  See D.E. 77 at 28.  Plaintiffs do not respond to this
argument, or even reiterate this claim, in their Memorandum of Law in opposition to this motion.
See generally D.E. 83.

I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be dismissed because Plaintiffs have abandoned it, and because, in any event, it is preempted. See Ortho Pharmaceutical Corp. v. Cosprophar, Inc., 828 F.Supp. 1114, 1129 (S.D.N.Y. 1993)(a party which failed to respond to movant's argument on a point at issue was deemed to have abandoned that claim). These state law contractual duties were implied from the CBA and the IBEW Constitution, so their resolution will inevitably involve interpretation of these contracts. Because the Supreme Court has held that federal common law is to govern the interpretation of labor contracts under Section 301, this claim is preempted by the LMRA. See Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 218 (1985)(finding that because state law claim was implied from labor contracts, it was preempted by Section 301).

## XIV.  Plaintiffs' Claims of Intentional Infliction of Emotional Distress

In their Amended Complaint, Plaintiffs allege that some or all of the defendants engaged in the intentional infliction of emotional distress through their repeated retaliatory acts. See D.E. 39 ¶ 131. Defendants argue that summary judgment should be granted on this claim because it is preempted by the LMRA, and because Plaintiffs have failed to establish the elements of such a claim. See D.E. 77 at 28.

Plaintiffs did not respond to this argument in their opposition papers or mention this claim. Plaintiffs have therefore abandoned this claim.

Whether Plaintiffs' intentional infliction of emotional distress claim is preempted by federal labor law is a closer question. Under New York State law, in order to make out a claim of intentional infliction of emotional distress, a plaintiff must show: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." See Bender v. City of New York, 78

F.3d 787, 790 (2d Cir. 1996). A state law claim is preempted by federal labor law "if the resolution of [that] claim depends upon the meaning" of either a contract between labor organizations or a contract between a labor organization and an employer. See Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 405-06 (1988); see also Monaco v. Smith, No. 00 Civ. 5845(RMB), 2004 WL 203009, at *12 (S.D.N.Y. 2004). Arguably, an evaluation of whether the union's conduct in failing to refer Plaintiffs to work constitutes "extreme and outrageous conduct" requires an understanding of the union's role as hiring hall, a role delineated in the CBA, which would suggest that this claim would be preempted. On the other hand, "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." See Livadas v. Bradshaw, 512 U.S. 107, 124 (1994) (citation omitted). Because Plaintiffs' interpretation of the CBA incorporates fewer exceptions to the chronological referral rule than Defendants' interpretation does, in Plaintiffs' view, Defendants have engaged in many more instances of retaliation than under Defendants'. Thus I conclude that determination of whether Defendants have engaged in extreme and outrageous conduct requires an interpretation of the CBA, and so Plaintiffs' intentional infliction of emotional distress claim is preempted.

However, even if I concluded that this claim was not preempted, I would still recommend it be dismissed because Plaintiffs have failed to establish that the union engaged in "extreme and outrageous conduct," which New York State courts have determined must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." See Murphy v. American Home Products Corp., 58 N.Y.2d 293, 303 (N.Y. 1983). Plaintiffs have also failed to

69

establish that Defendants intended to cause such severe emotional distress.

Therefore I conclude, and respectfully recommend that Your Honor should conclude, that summary judgment should be granted on Plaintiffs' claim of intentional infliction of emotional distress.

## XV.  Plaintiffs' Request to File a Second Amended Complaint

In their Memorandum of Law in opposition to this motion, Plaintiffs state: "Plaintiffs are proceeding under [LMRDA] § 102, and to the extent that plaintiffs' pro se amended complaint is unclear, plaintiffs seek leave to file a further amended complaint incorporating all of the events that have transpired since the original complaint was filed in July 2009.  There is no undue prejudice to defendants, as many of the events were testified to in June 2011."  D.E. 83 at 14. Defendants object to this request as untimely, coming ten months after the depositions to which Plaintiffs refer and over a year after they retained counsel, and argue that Plaintiffs have failed to show cause for the delay or explain what facts and claims a second amended complaint would include.  D.E. 87 at 17 - 18.

A party may request to amend a pleading under Federal Rule of Civil Procedure 15(a) either with the opposing party's consent or with the court's permission, which the court should "freely give . . . when justice so requires."  Fed.R.Civ.P. 15(a)(2).  "In the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.-the leave sought should, as the rules require, be 'freely given.'" Foman v. Davis, 371 U.S. 178, 182 (1962).  "While a court may not properly deny an amendment solely on the ground of delay, where . . . a considerable period of time has passed between the filing of the complaint

and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his [ or her ] neglect and delay." Sanders v. Car Mfg. Co., 582 F.Supp. 945, 952 (S.D.N.Y. 1983)(internal quotations and citations omitted).

Plaintiffs have provided the Court with nothing that would be sufficient to meet this burden. The sentences quoted above constitutes, in full, their request for leave to file a second amended complaint. The Court cannot attribute this delay to *pro se* litigants' unfamiliarity with federal litigation; Plaintiffs' counsel entered his notice of appearance on September 29, 2010. D.E. 49. According to the Court's notes of the November 9, 2010, conference, the first conference at which counsel appeared for Plaintiffs, the Court inquired whether he wished to file a second amended complaint, since Plaintiffs had filed their *pro se* amended complaint prior to his involvement. Counsel stated that upon his review of the transcripts of the prior conferences, he saw no need to amend the complaint, but might do so later, after depositions were taken. Depositions were conducted in June 2011, and discovery concluded in September 2011. The summary judgment motion schedule was set in November 2011. The first time Plaintiffs requested leave to file a second amended complaint, however, was in their March 21, 2012, opposition papers to the instant motion. Plaintiffs have provided no explanation for this delay.

In addition, Plaintiffs do not explain what their second amended complaint would contain, making it impossible for the Court to evaluate whether or not, in accordance with Federal Rule of Civil Procedure 15, justice would indeed require permitting the amendment. Thus, to the extent that Plaintiffs' Memorandum of Law implies a request to file a second amended complaint, this request is denied without prejudice to renewing such a request via

motion.  Any such motion is to be accompanied by a proposed second amended complaint.[16]

## XVI.  Plaintiffs' Request to Re-open Discovery to Depose Olivieri

In Plaintiffs' Rule 56.1 Counter-Statement (an unorthodox location for such a request), they seek a continuance to permit them to take Olivieri's deposition pursuant to Federal Rule of Civil Procedure 56(d).[17]  See D.E. 81 ¶¶ 86 - 91.  Plaintiffs now contend that since they "lack direct knowledge and information essential to justify their full and complete opposition" to Olivieri's affidavit and supporting documentation, the Court should re-open discovery to permit them to take Olivieri's deposition pursuant to 56(d).  D.E. 81 ¶ 86.  They allude to having not previously received some or all of the supplemental documentation which accompanies Olivieri's affidavit, and argue that they now must depose Olivieri to remedy Defendants' failure to produce these unspecified additional documents in discovery.

Defendants oppose this request.  They argue that there is no excuse for Plaintiffs' delay in requesting Olivieri's deposition because Plaintiffs have known that Olivieri was the union's referral agent since he began in that position in November 2008, and because they deposed the prior referral agent, but never sought to depose Olivieri.  D.E. 87 at 10.  Defendants, presuming that the additional documents they failed to produce were the supplemental documentation used as exhibits to Olivieri's affidavit, further argue that Plaintiffs knew the union produced written

---

[16]As my Order of Reference is for "All Matters," I may enter orders on nondispositive motions and proceed by Report and Recommendation on dispositive motions.  See D.E. 2. Plaintiffs' motion to amend is a nondispositive motion, and so I may dispose of it here.

[17]Plaintiffs state that this request falls under Fed. R. Civ. P. 56(f).  D.E. 81¶ 86. However, pursuant to the 2010 Amendments to the Federal Rules of Civil Procedure, the provisions of what was 56(f) are now incorporated in 56(d), and as Plaintiffs quote from what appears to be an earlier version of Fed. R. Civ. P. 56(f), the Court construes this motion as arising under what is now 56(d).

work orders for each referral, as Plaintiffs attached a work order as an exhibit to their Amended Complaint, but simply failed to request those work orders even after they retained counsel. Id. at 10 - 11.

In order for a non-movant to be granted relief under 56(d), he or she must show: "(1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." Miller v. Wolpoff & Abramson, LLP., 321 F.3d 292, 303 (2d Cir.2003) (internal quotations omitted; alteration in internal quotation). This showing is to be made by affidavit or declaration. Fed. R. Civ. P. 56(d).

Notwithstanding Plaintiffs' procedural error in the manner in which they request this relief, Plaintiffs here have simply not met their burden under the test above. Plaintiffs fail to state what facts Olivieri's deposition would provide, or how his deposition would create an issue of material fact. They do not state what steps, if any, they previously took to obtain Olivieri's deposition, and the Court finds no indication that Plaintiffs made any attempt to do so. Plaintiffs allude to Defendants' failures to produce, see D.E. 81 ¶86, and assert that deposing Olivieri would make up for this alleged deficiency, but do not explain how. Plaintiffs may be correct in asserting that Defendants failed in their discovery obligations under Federal Rule of Civil Procedure 26(a)(1)(A)(ii) and (e), but Plaintiffs have provided insufficient information for the Court to evaluate the merits of this request.

In addition, the Court can find no explanation for Plaintiffs' delay in making this request, and Plaintiffs have not provided one. Although Plaintiffs originally proceeded *pro se*, they have been represented by counsel since September 2010. D.E. 49, 51, 52. Plaintiffs appear to have

been well aware of Olivieri's position with the union, since Kazolias references Olivieri as "the referral agent" in his deposition testimony.  D.E. 80-4 at 94:2-3, 141, 145-47.  This request comes long after the close of discovery, which, according to the Court's notes of the September 8, 2011, telephonic conference, took place over a year ago.

Thus, I conclude that Plaintiffs' implied motion to depose Rosario Olivieri under Fed.R.Civ.P. 56(d) be denied, without prejudice to renewing this application in a manner which complies with Rule 56(d).

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that summary judgment should be denied in part and granted in part.

I respectfully recommend that summary judgment be denied with respect to the following claims:

1.  Kazolias's duty of fair representation claims arising out of job referrals on November 18, 2009, and March 2, 2010, as against the union;

2.  Kazolias's LMRDA claims arising out of the November 18, 2009, and March 2, 2010, job referrals, as against both the union and Maraia;

3.  Kazolias's LMRA breach-of-contract claims based on the challenged referrals listed in Section IV.B.1, as against the union and, to the extent that Plaintiffs seek equitable relief, as against Maraia;

4.  Swingle's LMRA breach-of-contract claims based on the challenged referrals listed in Section IV.B.2, as against the union and, to the extent that Plaintiffs seek equitable relief, as against Maraia;

5.  Roxby's LMRA breach-of-contract claims based on the challenged referrals listed in

VI.B.3, as against the union and, to the extent that Plaintiffs seek equitable relief, as against Maraia;

6. Kazolias's ADEA retaliation claims arising out of the challenged job referrals on November 18, 2009, and March 2, 2010, as against the union.

I respectfully recommend that summary judgment should be granted with respect to all other claims.

I further conclude that Plaintiffs' requests to depose Olivieri and to file a second amended complaint are denied without prejudice to renewing these applications in accordance with, respectively, Rule 56(d) and Rule 15(a). Any such motions shall be made before the undersigned by January 15, 2013; Defendants' opposition shall be made by February 12, 2013; and any reply, by February 26, 2013.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Richard Owen at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, New York, 10007, and to the chambers of the undersigned at the Hon. Charles L. Brieant Jr. United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Owen and

should not be made to the undersigned.

Dated: December 11, 2012
         White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

Copies of the foregoing Report & Recommendation have been sent to the following:

The Honorable Richard Owen

Robert N. Felix, Esq.
11 Broadway, Ste. 715
New York, New York 10004

Robert T. McGovern
Archer, Byington, Glennon & Levine, LLP
One Huntington Quadrangle,
P.O. Box 9064, Suite 4C10
Melville, NY 11747